# Exhibit A

**In the Matter of:**

BRADLEY AND KRISTAN STUBBLEFIELD

vs

SUZUKI MOTOR CORPORATION, ET AL.

*MALOUF, JR. , MICHAEL J.  Vol 1*

*September 11, 2017*



844.533.DEPO

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017

1      IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2          NORTHERN DIVISION

3
  BRADLEY AND KRISTAN STUBBLEFIELD,
4  HUSBAND AND WIFE          PLAINTIFFS

5  VS.      CIVIL ACTION NO. 3:15CV18HTW-LRA

6  SUZUKI MOTOR CORP., A
  FOREIGN CORPORATION; NISSIN KOGYO CO. LTD,
7  A LIMITED LIABILITY COMPANY;
  AND XYZ CORPORATIONS 1-5        DEFENDANTS
8

9    *****************************************

10
          ORAL DEPOSITION OF
11
      MICHAEL J. MALOUF, JR., ESQ.
12
        SEPTEMBER 11, 2017
13
         Volume 1 of 1
14
    *****************************************
15

16

17    ORAL DEPOSITION OF MICHAEL J. MALOUF, JR.,

18  ESQ., produced as a witness at the instance of the

19  Defendant Suzuki Motor Corp., and duly sworn, was

20  taken in the above-styled and -numbered cause on the

21  11th day of September, 2017, before Melinda Bowers,

22  CCR in and for the State of Mississippi, reported by

23  machine shorthand, at the offices of Butler Snow

24  1020 Highland Colony Parkway, Suite 1400, in the

25  City of Ridgeland, State of Mississippi.

844.533.DEPO

**Ex. A-2**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J.  Malouf, Jr.  - 09/11/2017                                                                    Pages 2..5

---

Page 2

1
2                    A P P E A R A N C E S
3   FOR THE PLAINTIFF(S):
4     Michael J. Malouf, Jr., Esq.
       Malouf & Malouf, PLLC
5      501 East Capitol Street
       Jackson, Mississippi 39201
6      mikejr@malouflaw.com

7     Richard Randolph Edwards, Esq. (via telephone)
       Cochran & Edwards
8      2950 Atlanta Road
       Smyrna, Georgia 30080
9      randy@cochranedwardslaw.com

10  FOR THE WITNESS:
11    Michael J. Malouf, Sr., Esq.
       Malouf & Malouf, PLLC
12     501 East Capitol Street
       Jackson, Mississippi 39201
13     mike@maloufflaw.com
14
15  FOR THE DEFENDANT NISSIN KOGYO CO. LTD:
16    Mark D. Jicka, Esq.
       Caroline Kunz Ivanov, Esq.
17     Watkins & Eager
       400 East Capitol Street
18     Jackson, Mississippi 39201
       mjicka@watkinseager.com
19     civanov@watkinseager.com

20  FOR THE DEFENDANT SUZUKI MOTOR CORP.:
21    Robert A. Miller, Esq.
       William Polk Thomas, Esq.
22     Butler Snow
       1020 Highland Colony Parkway, Suite 1400
23     Ridgeland, Mississippi 39157-8719
       bobby.miller@butlersnow.com
24     will.thomas@butlersnow.com
25

---

Page 3

1                          INDEX
2                                        PAGE
3   Appearances.......................................2
4   Stipulations.....................................4
5      MICHAEL J. MALOUF, JR., ESQ.
6      Examination by Mr. Miller.................7
7      Examination by Mr. Malouf, Sr............59
8   Changes and Corrections.........................63
9   Reporter's Certificate...........................65
10
11                     EXHIBIT INDEX
12  DEPOSITION                              PAGE
     EXHIBIT                               MARKED
13
14  No. 1  Order from Judge Wingate...................6
15  No. 2  Notice of Deposition......................6
16  No. 3  Subpoena..................................6
17  No. 4  Letter dated October 17, 2014.............18
18  No. 5  Letter dated October 21, 2014.............19
19  No. 6  Letter dated July 30, 2015...............21
20  No. 7  Letter dated August 2, 2016..............36
21  No. 8  Affidavit by Todd Hoover.................42
22  No. 9  E-mail dated July 29, 2016...............55
23
24
25

---

Page 4

1                    STIPULATIONS
2       It is stipulated by and between the
3   parties hereto and their respective attorneys at law
4   that the deposition on oral examination of the
5   witness, MICHAEL J. MALOUF, JR., ESQ., may be taken
6   before Melinda Bowers, CCR, Commissioner, Notary
7   Public for Lauderdale County, Mississippi, and that
8   the said deposition shall be taken in accordance
9   with the provisions of the applicable sections of
10  the Federal Rules of Civil Procedure.
11      It is further stipulated that all notices
12  provided for by said applicable sections of the
13  Federal Rules of Civil Procedure are waived, except
14  as to the reading over of said deposition to or by
15  the witness, the signing thereof by him/her and the
16  signing and certification of said Melinda Bowers,
17  CCR, and all other requirements and technicalities
18  of every sort regarding the taking and filing of the
19  deposition, except as hereinafter set out:
20      All objections saved as to the form of the
21  question asked are reserved until the time of trial
22  in accordance with the applicable provisions of the
23  said Federal Rules of Civil Procedure.
24
25

---

Page 5

1       It is further stipulated that the original
2   of this transcript be delivered to Robert A.
3   Miller, Esq., as custodian, for filing should the
4   Court so direct.
5
6       ---***************************
7
8       I, Melinda Bowers, CCR, Commissioner and
9   Court Reporter, certify that on this date, as
10  provided by the Federal Rules of Civil Procedure and
11  the foregoing stipulation of counsel, there came
12  before me at the offices of Butler Snow 1020
13  Highland Colony Parkway, Suite 1400, Ridgeland,
14  Mississippi, on the 11th of September, 2017,
15  commencing at approximately 9:33 a.m., witness in
16  the above cause, for oral examination, whereupon the
17  following proceedings were had:
18
19
20
21
22
23
24
25

Ex. A-3

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J.  Malouf, Jr.  - 09/11/2017                                                    Pages 6..9

Page 6

1           MICHAEL J. MALOUF, JR., ESQ.,
2      the witness, having first been duly sworn
3  to tell the truth, the whole truth, and nothing but
4  the truth, was examined and testified as follows:
5           MR. MILLER:  Let the record reflect that
6      the deposition of Mr. Mike Malouf, Jr. was
7      taken pursuant to order of the Court and the
8      notice and subpoena and pursuant to the Federal
9      Rules of Civil Procedure.
10          And, Mike, do you want to read and sign
11     your deposition?
12          THE WITNESS:  Sure.
13          MR. MILLER:  All right.  He'll read and
14     sign.
15          I want to attach as Exhibit 1 the order
16     from Judge Wingate.  And Exhibit 2 will be the
17     re-notice of taking video -- well, we're not
18     taking the video deposition, but that's what it
19     says, notice of the deposition.
20          (Exhibits 1 and 2 were marked.)
21          MR. MILLER:  And Exhibit 3 will be the
22     subpoena.
23          MR. MALOUF, SR.:  Do you have a copy of
24     that Exhibit 2?
25          (Exhibit 3 was marked.)

Page 7

1                 EXAMINATION
2  BY MR. MILLER:
3      Q    Exhibit 3 is the subpoena duces tecum and
4  there is a Schedule A that requests a number of
5  items having to do with the motorcycle and some test
6  riding that was done by Preston Lind.  Did you bring
7  any documents with you pursuant to the subpoena?
8      A    I did not bring you any documents.  I've
9  given you the documents earlier, the letter with the
10 documents from Jeff Hyatt with regard to the chain
11 of custody.  I did a search for Preston Lind and --
12 what else did you ask for?  I did a search on
13 Preston Lind.  I did not have any texts or e-mails
14 or anything with regard to Preston Lind.  That must
15 have been on an old phone, may have been
16 destroyed -- not destroyed but just turned in over
17 time.
18          But I also did a search for Dan
19 Stubblefield.  I only sent one e-mail to Dan
20 Stubblefield.  It was his deposition so that was in
21 June-ish of 2017.  It was just an e-mail saying
22 here's your deposition.  He was supposed to read and
23 sign.  So that -- that was an e-mail to him.  No
24 other e-mails to and from Dan Stubblefield.
25          There was a few texts to Dan

Page 8

1  Stubblefield.  It was June 2017, also about his
2  deposition.  He asked me to call him.  It just said,
3  "Call me."  And then I sent him some texts in August
4  of 2017 related to photographs that we were
5  produced.  I asked him to -- if he had photographs
6  of Dan's -- of the son.  And so it was a few texts
7  to him.  Other than that, there were no other texts.
8  There certainly weren't any texts between -- I don't
9  know that I've ever texted him before his
10 deposition.
11     Q    Okay.  But you did send some e-mails to
12 Dan Stubblefield?
13     A    I sent one e-mail to Dan Stubblefield and
14 I can produce that to you, but it was a -- it was an
15 e-mail regarding -- it -- it attached his
16 deposition.  It didn't even say anything other
17 than -- I'm not aware of it saying anything other
18 than, "Here's your deposition," for him to read it.
19     Q    So you produced everything in your custody
20 having to do with the chain of custody subject
21 motorcycle from the date of the accident to the
22 present?
23     A    Yes.
24     Q    Have you ever given a deposition before,
25 Mike?

Page 9

1      A    I was trying to think about that the other
2  day.  I know -- I know Butler Snow has asked me to
3  give a deposition before.  I think we started the
4  deposition.  I don't think I ever gave a deposition.
5  As I sit here today, I don't know that I've given
6  another deposition.
7      Q    Okay.
8      A    It's possible but it would have been 20
9  years plus.
10     Q    All right.  I'm going to ask you some
11 questions about your background and -- and how long
12 have you been practicing law?
13     A    Twenty years.
14     Q    And have you done litigation during that
15 entire time?
16     A    Yeah.  Sure.
17     Q    And is most of that civil litigation as
18 opposed to criminal?
19     A    Sure.  Yes.
20     Q    And what percentage of that work in civil
21 litigation is related to product liability over the
22 last 20 years?
23     A    Maybe --
24          MR. MALOUF, SR.:  You counting this case?
25          THE WITNESS:  Well, it doesn't --

**Ex. A-4**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                                            Pages 10..13

Page 10

1          MR. MALOUF, SR.:  Percentage goes up with
2     this case.
3     A    Yeah.  I mean, less than -- less than
4     10 percent.  Maybe less than 5 percent.  Most of my
5     stuff is workers' comp, automobile, stuff of that
6     nature, so products liability are few and far
7     between.
8     BY MR. MILLER:
9     Q    All right.  And you've been involved in a
10    couple of cases that have been reported like the
11    Estes v. Lyon Workspace Products.  Do you recall
12    that?
13    A    Yeah, I do.
14    Q    All right.  And did both you and your
15    father Mike Malouf, Sr. work on that case?
16    A    Yes, we did.  I'm trying to recall that
17    litigation.  But, sure, I recall the name, yes.
18    Q    And what was the product involved in that?
19    A    That's what I'm sitting here thinking
20    about.  It was more -- it was a workers' comp case
21    that involved into a -- oh, it was a chair.  He was
22    a welder.  The chair failed.
23    Q    Okay.  And then there's a Palmer v.
24    Volkswagen of America, Inc. case that you were
25    involved in; is that correct?

Page 11

1     A    Yeah.  Sure.  That was air bag litigation.
2     Q    All right.  And was Mr. Jicka who is
3     present here involved in that case?
4     A    I don't think so.  Huh-uh.
5     Q    I was just curious.
6     A    No.  That was David Ayers and other nice
7     attorneys.
8          MR. MALOUF, SR.:  And Judge Yerger.  That
9     was the main party, Judge Yerger.
10    BY MR. MILLER:
11    Q    Okay.  Your firm has a website and it
12    says, "Guiding clients through the claims process
13    since 1970."  It says, "The law offices of Malouf &
14    Malouf, PLLC has successfully handled dangerous
15    product liability claims on behalf of our clients
16    for numerous years.  Our Jackson injury attorneys
17    have filed claims involving automobiles, toys,
18    furniture, tractors, food products, and
19    pharmaceutical drugs.  If you have been injured as a
20    result of a defective product, our experienced team
21    can help you pursue justice.  We evaluate your claim
22    without charge, and if we determine that you have a
23    meritorious case, we then offer representation on a
24    contingency fee basis.  This means we are only paid
25    if we make a recovery on your behalf."

Page 12

1          So, with that statement as part of
2     your website, you would agree that your firm holds
3     itself out as being competent to handle product
4     liability cases?
5     A    We're certainly competent to handle
6     product liability cases.  With regard to the exact
7     wording of the website, a company does that for us
8     and, in all honesty, I don't know that I've reviewed
9     that language in years, and that's the language they
10    put up there.  But, yes, we are competent to handle
11    product liability cases.
12    Q    And product liability cases usually -- not
13    usually, but always involve some sort of product
14    that's a physical object.  And if it is available,
15    it needs to be preserved as evidence, doesn't it?
16    A    Sure.
17    Q    Are there any other types of cases besides
18    product cases where physical objects need to be
19    preserved?
20    A    As I sit here today, I -- I don't know.
21    Q    Okay.  I want to get into your experience
22    riding motorcycles.  Have you ever owned a
23    motorcycle?
24    A    Yes.
25    Q    What kind of motorcycle?

Page 13

1     A    It was a while back.  I think it was a
2     Yamaha, maybe FJ1100.
3     Q    And how long ago did you have that
4     motorcycle?
5     A    How long ago did I have it?
6     Q    Right.
7     A    I had it in college.  So...
8          MR. MALOUF, SR.:  I didn't know about it,
9     though.  You can put that in there.
10    BY MR. MILLER:
11    Q    Did you have a motorcycle endorsement on
12    your driver's license?
13    A    No.
14    Q    How long did you have your Yamaha
15    motorcycle?
16    A    Maybe a year.
17    Q    And that was a street motorcycle?
18    A    Yeah.
19    Q    Okay.  And how many miles did you put on
20    it?
21    A    I have no idea.
22    Q    Did you take it on cross-country trips
23    or --
24    A    No.
25    Q    -- did you ride around town?

**Ex. A-5**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J.  Malouf, Jr.  - 09/11/2017                                                    Pages 14..17

Page 14
1      A   No.  I drove it to Oxford and thought I
2   was going to die with the wind shear and everything
3   else.  So it's not something you take -- not
4   something I take more than five or ten miles.
5      Q   Okay.  When you say with the wind shear,
6   what do you mean by that?
7      A   Well, you don't have a windshield.
8      Q   Oh, windshield.  I thought you said shear.
9   Okay.  It did not have a wind -- windshield?
10     A   Huh-uh.  It was my face.
11     Q   All right.  Did you have any training in
12  riding motorcycles?
13     A   No.
14     Q   Did you ever ride dirt bikes?
15     A   Not -- no.
16     Q   Okay.
17     A   I have before, but nothing to speak of.
18     Q   How many hours total do you think you
19  operated your Yamaha motorcycle?
20     A   It would be a pure guess.  I have no idea.
21  I rode it to class a few times.  Rode it on the
22  weekends a few times.  If I rode it, I would not
23  ride it more than 30 minutes on a trip.  I had it
24  for a year.  A bunch of friends had one.  We'd go
25  riding, so I can't -- I can't tell you.

Page 15
1      Q   Did you buy it new or used?
2      A   Used.
3      Q   Okay.  And I guess you sold it eventually?
4      A   I did.
5      Q   And how much did you sell it for?
6         MR. MALOUF, SR.:  Is all of this relevant,
7   Bobby?  The purchase of his motorcycle 25 years
8   ago, is that relevant?
9         MR. MILLER:  I'm just trying to get into
10  his experience and condition of motorcycle.
11        MR. MALOUF, SR.:  Well, selling a
12  motorcycle is not -- I'm going to tell him not
13  to answer that one.
14        MR. MILLER:  That's fine.
15  BY MR. MILLER:
16     Q   When you operated this motorcycle, did you
17  use both the front brake and the rear brake when you
18  were braking?
19     A   Have I ever used the back brake on it?
20  Probably.  But on an average stop, no, I use front
21  brake only.
22     Q   Did you ever do any work on the brakes on
23  that motorcycle?
24     A   Never.
25     Q   Did you ever ride friends' motorcycles in

Page 16
1   the last 30 years or so?
2      A   When I was in college, --
3      Q   Yes.
4      A   -- I had a ton of friends that had
5   motorcycles.  We all had motorcycles.  I rode their
6   motorcycles.  Since then, I have not ridden a
7   motorcycle.
8      Q   You were attorney of record for the
9   Stubblefields in this case in the accident that
10  occurred in January 2012, involved Bradley
11  Stubblefield.  And after that time, at some point in
12  time, you came to represent them; is that correct?
13     A   Sure.
14     Q   Okay.  And do you recall that there was a
15  pre-litigation inspection of the subject motorcycle,
16  a GSXR1000 on September 4, 2014?
17     A   Yeah.  I had sent Suzuki a letter back,
18  what, six or seven months before that in April,
19  asking them to come to preserve the bike, inspect
20  the bike, and analyze the bike.  It took about six
21  or seven months, whatever, and subsequently they
22  came.  They did a protocol, and the bike was
23  thoroughly inspected in September of 2014 by Suzuki
24  and Nissin.
25     Q   Do you recall the names of the

Page 17
1   representatives who were there?
2      A   No.  I was looking at that because there
3   were certain comments made there by those
4   representatives and I have not gone back to the
5   roll call to see who made those certain comments and
6   stuff.
7      Q   And what comments were those?
8      A   Well, just what they saw, what they
9   observed, and the comment that sticks out most from
10  everything was -- I believe it was an N.K. -- it was
11  an older gentleman with a grayish hair.  I remember
12  when everybody was taking photographs, he came up
13  and asked me if he could pull the brake.  I said,
14  "Well, does it matter if you pull the brake?"  He
15  said, "No."  I said, "Well, then you can pull the
16  brake."  And he started pulling the brake before we
17  did any of the inspections, and I just remember he
18  and I had that conversation whether or not pulling
19  the brake would affect anything and he said no.  So
20  I said, "Sure."
21     Q   How many times did he pull the brake?
22     A   In my presence while I was kind of looking
23  there, maybe two or three.
24     Q   All right.  And then later, there was some
25  force measurements taken of the front brake lever;

**Ex. A-6**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                           Pages 18..21

Page 18

1  is that correct?
2      A   There were.
3      Q   Yeah.  Okay.  Following that inspection,
4  did you receive this letter dated October 17, 2014
5  from Suzuki from Cathi Black?
6      A   Yeah.  I didn't receive it on this date.
7  But I subsequently did receive it.
8      Q   Okay.
9          MR. MILLER:  Make that Exhibit 4.
10         (Exhibit 4 was marked.)
11  BY MR. MILLER:
12     Q   The last paragraph of the letter says,
13  "Should your client choose to continue to pursue
14  this claim, please preserve the motorcycle in its
15  current condition.  Also, if you plan to do any
16  further inspection or testing of the motorcycle,
17  please give us prior notice or to give us an
18  opportunity to be present."  Do you recall reading
19  that?
20     A   At some point, I did.
21     Q   Okay.
22         MR. MALOUF, SR.:  Did you make that an
23  exhibit?
24         MR. MILLER:  Four.
25     A   But I will say that statement was

Page 19

1  certainly inconsistent with the statements that were
2  made at the inspection.
3  BY MR. MILLER:
4      Q   How is that?
5      A   Because Suzuki and Nissin both made it
6  very clear that they weren't going to do any other
7  inspections, that they were done, they had seen
8  everything they wanted to see and, upon their
9  belief, the bike was not defective.  So their
10  participating in any other inspections certainly was
11  not going to happen based on their -- what they told
12  me at that time.
13     Q   And then on -- sometime later in October,
14  this letter is dated October 21, 2014 from Mr. Mark
15  D. Jicka at Watkins & Eager.  Did you receive that
16  letter?
17     A   I obviously did.  Do I recall receiving
18  this letter, I do not.  But it was made an exhibit
19  later.  But I'm -- I'm sure I did.  You asked me do
20  I recall receiving it, I do not.
21         MR. MILLER:  I want to make that
22  Exhibit 5.
23         (Exhibit 5 was marked.)
24  BY MR. MILLER:
25     Q   And this letter says, "The experts also

Page 20

1  determined that the measured brake lever resistance
2  force was sufficient and that the front brake was
3  functional and capable of stopping
4  Mr. Stubblefield's motorcycle."  And then it says,
5  "If you decide to continue with this claim or to
6  file suit, please preserve the motorcycle in its
7  current condition.  Also, if you plan to do any
8  further inspection or testing of the motorcycle,
9  please give us prior notice so we can -- so we can
10  have an opportunity to be present."  And did you
11  understand that last paragraph, that they wanted
12  it -- that --
13     A   Sure.
14     Q   -- Nissin Kogyo wanted to be present if
15  you tested it again?
16     A   It was very similar to your letter.  Like
17  I said, I don't know when I received it but that's
18  exactly what was done for that first inspection.
19     Q   Then after we got into litigation, Kat
20  Carrington of our office sent you a letter dated
21  July 30, 2015.  Do you recall getting that?
22     A   I don't specifically recall receiving it
23  but I have read it before.  It's part of y'all's
24  motions.
25         MR. THOMAS:  I think this one has been

Page 21

1  marked up, this copy, so...
2          MR. MILLER:  Okay.  We'll use this copy.
3          MR. THOMAS:  Is that one marked up?
4          MR. MILLER:  Huh-uh.
5          MR. THOMAS:  Okay.  And that's --
6          MR. MILLER:  Okay.  Make that Exhibit 6.
7          (Exhibit 6 was marked.)
8  BY MR. MILLER:
9      Q   Do you recall this letter with the ASTM
10  standards attached?
11     A   I recall it during the motion.  I don't
12  recall receiving it in June or July, whenever it was
13  sent, 2015.
14     Q   And the third paragraph says, "The subject
15  motorcycle is an important piece of evidence for all
16  parties involved."  And do you agree with that?
17     A   Yeah, which is why I had you guys come and
18  preserve the motorcycle at the first inspection.
19     Q   And, also, the -- in that same paragraph,
20  Kat says, "We request that the subject motorcycle
21  remain stationary and be stored in a dry, secure
22  area and not be used."  Do you recall that?
23     A   No, I don't recall that.
24         MR. MILLER:  Bless you.
25         THE COURT REPORTER:  Thank you.

844.533.DEPO

**Ex. A-7**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                    Pages 22..25

**Page 22**

1  BY MR. MILLER:
2     Q   Have you ever reviewed the ASTM standards
3  regarding the preservation of evidence?
4     A   Not before -- not that I recall.
5     Q   I mean, like in other cases before this
6  one, did you have any occasion to review these
7  standards?
8     A   No.
9     Q   One of the standards is designated
10  E 1188-05.  The other one is E 860-97.  Did you read
11  these standards when Kat sent them to you?
12     A   I read them at some point.
13     Q   And do you agree that Kat's letter, the
14  second to the last paragraph says, "If your clients
15  contemplate selling the subject motorcycle,
16  disposing of the subject motorcycle, altering the
17  subject motorcycle, disassembling the subject
18  motorcycle, testing the subject motorcycle, or
19  engaging in any other activities which in any way
20  may alter the post-accident condition of the subject
21  motorcycle, including altering any evidence such as
22  markings and scratchings on the subject motorcycle,
23  please notify me immediately."  Do you agree that's
24  what she said?
25     A   The letter says what it says.  I mean,

**Page 23**

1  whatever the letter says.
2     Q   Then she says, "If your clients have
3  altered or changed the subject motorcycle in any way
4  since the accident, please tell us in detail what
5  changes or alterations have been made."  Do you
6  agree that's what it says on the second page?
7     A   Yes.
8     Q   Okay.  Have you gotten or received
9  evidence preservation letters in other cases before
10  this one?
11     A   No.
12     Q   Have you got -- have you received any
13  evidence preservation letters in any cases after
14  this one was filed?
15     A   Not that I'm aware of, no.
16     Q   Okay.  There was some riding of the
17  subject motorcycle conducted by a young man named
18  Preston Lind and I'm going to ask you some questions
19  about him.  How did you happen to know Preston Lind?
20     A   I didn't know him.  I was asking friends,
21  asking mechanics, asking anybody I knew if they knew
22  a professional motorcycle rider, and his name came
23  up.  And I don't even know how I got in touch with
24  him but his name came up and I contacted him and he
25  said he was an experienced rider.

**Page 24**

1     Q   And how did you contact him?  I mean, did
2  you call him or --
3     A   Yeah.  Just called him.
4     Q   Okay.  How did you get his number?
5     A   One of my contact friends, a friend of a
6  friend I think led me on to him.
7     Q   All right.  Do you know who that was?
8     A   No.
9     Q   Did you ever meet his mother, Jennifer
10  Lind?
11     A   No.  I mean, I -- I think I knew her as
12  kids.  I had no idea they were related.  But I think
13  we knew -- I knew her as a child, I guess.
14     Q   I mean, did you talk to her at all since
15  childhood?
16     A   No.  No.  I -- no.
17     Q   Have you talked to her at all in the last
18  two years?
19     A   No.  I didn't know that was her child
20  until the day of her deposition.
21     Q   What did you ask Mr. Lind to do?
22     A   I asked Mr. Lind to evaluate whether or
23  not -- or to tell me if that motorcycle was
24  performing as he expected.
25     Q   Do you have any -- did you have any

**Page 25**

1  background information on the types of motorcycles
2  Mr. Lind had ridden?
3     A   No.
4     Q   Do you know if he had ever ridden a Suzuki
5  before?
6     A   No.
7     Q   And how was he going to evaluate this
8  particular motorcycle?
9     A   I guess just based on his experience.
10  We -- we had nothing to compare it to, and so that's
11  why I didn't really consider it a scientific or
12  valid test.  It was merely an observation for me to
13  go forward with the litigation.
14     Q   And when did you contact him, in what
15  month and year?
16     A   It would have been shortly before his ride
17  and after -- after your inspection.
18     Q   So it would have been after the
19  September 4, 2014 inspection?
20     A   Yes.
21     Q   Okay.  I believe you said later in a
22  letter that you wrote to me that the riding was in
23  November; is that correct?
24     A   It was the last part of October, first
25  part of November.  It was -- it was -- my best

**Ex. A-8**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J.  Malouf, Jr.  - 09/11/2017                                       Pages 26..29

Page 26

1  recollection was the first of November, but it could
2  have been end of October.
3      Q   Did you agree to pay Mr. Lind for riding
4  the motorcycle?
5      A   I did.
6      Q   And did you pay him?
7      A   I have not paid him yet, no.
8      Q   Okay.  How much did you agree to pay him?
9      A   I think we agreed to $20 an hour.
10     Q   And how many hours did he have involved in
11  this test riding?
12     A   I think it was less than -- it was right
13  around an hour.  And that's why once litigation got
14  involved, he was going to come back and do more
15  riding tests and he wanted to add it altogether and
16  I said, "Fine."
17     Q   Was there ever any writing of any kind,
18  like an e-mail or text message or anything like
19  that, between you and Preston Lind?
20     A   I don't have any text message.  I don't
21  believe there was.  I think it was all phone calls.
22  I know after when I was looking for him, I sent him
23  a text message because he wouldn't return my phone
24  calls.
25     Q   Uh-huh.

Page 27

1      A   But before that, I'm not aware that I sent
2  him any text messages.  I could have but I just -- I
3  don't have them and I think everything was voice
4  calls.
5      Q   At some point in time, you provided me and
6  others with a telephone number for Preston Lind,
7  (850) 225-0007?
8      A   Uh-huh.
9      Q   And where did you get that number?
10     A   I think that's the number I always had for
11  him, I think.
12     Q   Was it stored on your cell phone or was it
13  written down somewhere?
14     A   It was not -- I don't know if I -- it
15  could have been stored in my phone.  That would have
16  been the most likely way to get it.  But I think
17  also at the same time, when I was looking for him, I
18  was calling all my mechanics to figure out who would
19  have his phone number or if it was an updated phone
20  number, so it was either -- either already on my
21  phone or contacting my friends who -- try to see if
22  I could find his phone number that way as well.  So
23  one of those two.
24     Q   What is your cell phone provider?
25     A   Mine is C-Spire.

Page 28

1      Q   And is the account in the name of Michael
2  Malouf, Jr.?
3      A   No.
4      Q   What is -- what is the account?
5      A   Malouf Downtown Properties.
6      Q   Do you remember what day, what specific
7  day Preston Lind did the test riding?
8      A   No.  You asked me that.  I don't.
9      Q   And how did you get the motorcycle from
10  wherever it was to the JFC complex?
11     A   It was on a trailer.
12     Q   And whose trailer was it?
13     A   I think it was Dan Stubblefield's trailer.
14     Q   And where was the bike located before the
15  testing?
16     A   At the warehouse down on South State
17  Street.
18     Q   What is the name of the warehouse?
19     A   There's no name on it.  It's just 856
20  South State Street.
21     Q   Okay.  And is that something that you own
22  or lease?
23     A   I own it.
24     Q   And do you store objects that are related
25  to litigation there?

Page 29

1      A   I have.
2      Q   How did the motorcycle get to the
3  warehouse on South State Street from Dan
4  Stubblefield's garage?
5      A   On that trailer.  It was on that trailer.
6  And I picked it up from his house, took it to the
7  warehouse, and it was stored there.
8      Q   Between the time of the inspection on
9  September 4, 2014, and this riding by Preston Lind,
10  did anybody operate the motorcycle in any way?
11     A   No.
12     Q   Did anybody crank the motorcycle or do
13  anything to it, change the oil or anything?
14     A   No.  Not that I'm aware of.
15     Q   When you moved the motorcycle from the
16  warehouse to the JFC, which is Jackson Football Club
17  complex, did you and Preston Lind put the bike on
18  the trailer or did you do that by yourself?
19     A   It was already on the trailer.
20     Q   So it just stayed on the trailer?
21     A   Stayed on the trailer.
22     Q   And you think it was Dan Stubblefield's
23  trailer?
24     A   I believe so.
25     Q   Do you know where it is now, the trailer?

**Ex. A-9**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                    Pages 30..33

Page 30

1    A   I -- Dan has it.
2    Q   Was this testing on a weekend, do you
3  recall, or not?
4    A   Probably not.
5    Q   What time of day was the testing?
6    A   I have no -- I would assume 2:00.
7    Q   And what was the weather like that day?
8    A   Pretty day.
9    Q   All right.  So the surface was dry?
10   A   Yeah.
11   Q   Did you give Mr. Lind any guidance or
12 directions about what to do to test the bike?
13   A   I did not.
14   Q   What did you ask him to do?
15   A   I asked him to observe whether or not the
16 front brake was proper.
17   Q   And did you ask him to use the rear brake?
18   A   No.
19   Q   Was anybody there besides you and
20 Mr. Lind when he was riding the bike?
21   A   No.
22   Q   And where did this riding take place?
23   A   At the JFC soccer field, the same location
24 that I met you and Mr. Hoover out there for him to
25 do his riding test.

Page 31

1    Q   Okay.  Part of that parking lot is -- or a
2  lot of it is paved asphalt and some of it is what's
3  called chip seal.
4    A   Uh-huh.
5    Q   Do you know what I'm talking about?
6    A   I do.
7    Q   Where did he ride the bike, or did he ride
8  it on both surfaces or just one or the other?
9    A   Both.
10   Q   Okay.  When he was testing the brakes,
11 where was he riding the bike when he was applying
12 the brakes?
13   A   Mostly on the chip seal.
14   Q   Did you take any photographs of this
15 testing?
16   A   I did not.
17   Q   Did you take any video?
18   A   I did not.
19   Q   Did you take any notes?
20   A   No.  There was nothing to take.
21   Q   Did you tell Preston Lind anything about
22 Bradley Stubblefield's accident?
23   A   I'm sure I did.  I mean, I'm sure I said
24 that there's a question whether or not the front
25 brakes will adequately stop while riding.  And --

Page 32

1  and I don't know that I would have told him anything
2  else.
3    Q   Did you tell him what speed to operate the
4  motorcycle?
5    A   I told him that -- not necessarily.  I
6  just said we think Mr. Stubblefield was going
7  somewhere between 30 to 40 miles per hour.
8    Q   Did you -- tell me what you saw Preston
9  Lind do after the bike was off the trailer.
10   A   He pulled the brake several times.  And he
11 was going to warm up the bike or test drive it
12 because I wanted to make sure he was comfortable
13 even doing it.  So we put the brake in position six
14 because that was the only position that would have
15 any pressure to give him any type of assistance.
16 And so he rode the bike around several laps, came
17 back and said he felt comfortable to try to apply
18 the brakes going 30 to 35 miles per hour.  I said
19 okay.  And that's what he did.
20   Q   What type of brake levers were on the bike
21 during this riding?
22   A   We didn't change any brake levers, so
23 whatever was on there at the end of Suzuki's
24 inspection.  As I sit here today, I have no idea.
25 But brake levers have never been changed or placed

Page 33

1  by me, so...
2    Q   So you don't know whether there was
3  aftermarket brake levers that were on at the time of
4  the accident or the original equipment brake levers?
5    A   I do not know.
6    Q   So how many times did Mr. Lind apply
7  brakes to stop the motorcycle?
8    A   I provided a letter earlier stating to the
9  best of my recollection that he made several runs in
10 my presence.  How many times he pulled that front
11 brake, I have no idea.
12   Q   Did you tell him anything about the
13 potential that gravel at the accident scene might
14 have had some -- something to do with
15 Mr. Stubblefield's accident?
16   A   I have no idea.  I don't specifically have
17 that recollection or recall discussing that with
18 him, gravel, but --
19   Q   Did you -- go ahead.
20   A   I don't recall.
21   Q   Okay.  Did you ask Mr. Lind to try to
22 brake in some gravel out there?
23   A   No.  But -- no.  No.  I did not ask him to
24 do any type of braking in gravel.
25   Q   Did you tell Mr. Lind that the brakes had

**Ex. A-10**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                      Pages 34..37

Page 34

1  not been used in almost three years?  I think 2
2  years and 11 months.
3     A   No.
4     Q   Did you tell him that the brake fluid had
5  not been changed in the last two years and 11 months
6  at least?
7     A   No.
8     Q   So what do you recall happening out there
9  that day as far as what you observed Mr. Lind do?
10    A   I recall him making several loops.  I
11 recall asking him if he felt like the brake was
12 responsive, as he's familiar with his bikes.  He
13 said no.  I said, "Can we quantify that?  Is there
14 any way we can decide?  Do we -- can we quantify
15 it?"  We had no instrumentation out there.  And he
16 said, "Well, I'll try to" -- there were lines out
17 there.  He was going to try to start applying the
18 brake at one line and see how far it would go.  He
19 was not able -- he was not capable of stopping when
20 the line came up.  And so that's all I recall.  I
21 was sitting there.  He could not do that.
22    I said, "Well, look, we need -- we
23 need something.  We need instrumentation or
24 something to try to record this."  We certainly
25 didn't have anything.  So we stopped doing

Page 35

1  everything.  We weren't able to get any relevant
2  information out of it other than a general opinion,
3  which we already had, that the brakes were not being
4  responsive.
5     Q   But you agree that it had been about two
6  years and 11 months since the brakes had been
7  operated on that motorcycle?
8     A   Yes, sir.
9     Q   When Mr. Lind rode it?
10    A   Yes.
11    Q   Now, how many laps did Mr. Lind ride the
12 motorcycle?
13    A   I don't know.  It would have been 2.7
14 miles worth, whatever that is, and I don't even know
15 the length.  I know we went from one side to the
16 other side of the parking lot.  So I know we did
17 several with the different brake positions, seeing
18 if that would make a difference.  And so I know we
19 did several with different brake positions.  But
20 that was it.
21    Q   Okay.  You wrote a letter to me and to
22 Mr. Mark Jicka dated August 2, 2016.  Do you recall
23 that?
24    A   I do.
25        MR. MILLER:  I want to make this letter

Page 36

1        Exhibit 7.
2        (Exhibit 7 was marked.)
3  BY MR. MILLER:
4     Q   The first part of the letter is a chain of
5  custody of -- and this is something that the Court
6  ordered by order July 28, 2016, that you describe
7  the chain of custody; is that right?
8     A   Yes.
9     Q   And you said that from the date of the
10 accident, Dan Stubblefield had possession of the
11 bike in his personal garage, and I'm paraphrasing.
12 On or about October 2014, it was moved by you to a
13 storage unit that you just described at 856 South
14 State Street in Jackson until March 4, 2016.  And
15 then you took it to Marietta, Georgia to your
16 expert's place of business at Applied Technical
17 Services there; is that correct?
18    A   Yes.
19    Q   Then you have a description on the second
20 page of your letter of the operation of the
21 motorcycle between September 4, 2014 and May 13,
22 2016.  And how did you recall the different laps and
23 brake response and the various things that you have
24 here in this paragraph?
25    A   It was a pure guess.  I just -- I did the

Page 37

1  best I can to recall the intent of going out there
2  and my -- my thoughts with how many laps he would
3  have done during that period.  Could it have been a
4  few more?  It probably wasn't any less.  Could it
5  have been a few more, sure.  But I know in general,
6  he rode it several laps to make sure he could --
7  felt comfortable on the bike.  And then I know we
8  changed the brake lever positions two or three times
9  or three or four times.  And so that's how I came up
10 with this.  And that's just the best of my
11 recollection at the time.
12    Q   Would Mr. Lind say something to you after
13 each lap?
14    A   I don't think he did.
15    Q   How do you know whether or not the front
16 brake engaged or not?
17    A   That was just my observation of whether or
18 not it locked up.
19    Q   So were you looking for the wheel to lock
20 up?
21    A   I was.
22    Q   And do you know that it's not necessary to
23 lock up the front wheel in order to have a braking
24 force?
25    A   According to Mr. Hoover, I understand

**Ex. A-11**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                    Pages 38..41

Page 38

1  that, yeah.
2      Q   So when you say that the front brake
3  engaged on this last final lap at speeds 28 to 30,
4  then the front -- you say the front brake engaged,
5  so the front wheel was locked?
6      A   Yes.
7      Q   You observed it locked?
8      A   Yes.
9      Q   And it skidded?
10     A   I don't know that it skidded but it -- it
11  came -- it had more force than anything else.  But
12  no, did I -- I did not observe it skidding.  I do --
13  I believe it came very close to locking up, as
14  Mr. Hoover will say.  Now, whether or not it's -- I
15  did not observe it skidding or locking up like I
16  would any other lockup, but, yes, it -- it came very
17  close of not locking up.
18     Q   Is that the only time it came close to
19  locking up?
20     A   That I observed it, yes.
21     Q   Were there some other times that you might
22  not have observed it when Mr. Lind was operating it?
23     A   It is possible when he went to both ends
24  of the -- when he went to both ends -- I was
25  standing in the middle.  So when he went to other

Page 39

1  ends to turn around or do whatever, I was not able
2  to observe any type of braking that he did then.
3      Q   Do you -- do you know if he locked up the
4  rear wheel at any time?
5      A   I do.
6      Q   What do you know about that?
7      A   I just -- I -- I saw him lock up the rear
8  wheel.  So, I mean, --
9      Q   How many times did he lock up the rear
10  wheel?
11     A   I only saw it one time.
12     Q   And how many times did he lock up the
13  front wheel?
14     A   I only saw it one time.
15     Q   How many times do you think Mr. Lind
16  applied the front brake lever during that 2.7 or 2.8
17  miles of test riding?
18     A   I'd say -- I have no idea.
19     Q   When you say the front wheel you observed
20  lock up, how long was it locked up?  What was the
21  duration in seconds or distance?
22     A   It was not a second.  It was no distance.
23  I mean, it was -- it would come to a slow stop.
24  It --
25     Q   Okay.

Page 40

1      A   The -- the bike, as I observed that one
2  time, he did not -- the -- of course, I can't see
3  his hand movement, but he was not going full speed
4  and it locked up and it took several seconds and it
5  drug.  That did not happen.  What happened was he
6  was going, it came to a very slow stop, and then
7  seconds before the bike came to a complete stop, the
8  wheels locked at that point.  So --
9      Q   The front wheel?
10     A   The front wheel stopped.
11     Q   Okay.
12     A   But it was at the end of a rolling stop.
13  It was not a lockup as you would observe on a car or
14  anything else like that.
15     Q   Did Preston Lind tell you that the brakes
16  were not engaging or is this just something that you
17  observed?
18     A   Well, when you say the brakes, he said the
19  back brake worked fine, so the back brake worked
20  fine.  I observed -- I observed that and that's what
21  he told me.  The front brakes -- what was your
22  question?
23     Q   Well, did he tell you after each lap how
24  the brakes performed or did you just observe how the
25  back brakes performed?

Page 41

1      A   I just observed at the end, overall, he
2  said, "Yes, this is not performing as it should."
3  That was his statement with regard to the front
4  brakes.  But he did not stop after every ride and
5  say -- give me a percentage or anything.
6      Q   Did Preston Lind ever tell you whoever
7  wrecked the bike obviously did not know how to ride
8  because there was nothing wrong with the motorcycle?
9      A   Absolutely not.  And that's contrary to
10  him saying the brakes still were not functioning
11  properly.
12     Q   Did he say there was nothing wrong with
13  the bike?
14     A   He said there was nothing wrong with the
15  back brake.
16     Q   Did he say there was nothing wrong with
17  both brakes?
18     A   No.
19     Q   Did you look at the tires after this test
20  riding by Preston Lind?
21     A   I did not.
22         MR. MILLER:  I'm going to attach this
23  series of photos that we had produced attached
24  to an affidavit by Todd Hoover, and this will
25  be Exhibit 8.

Ex. A-12

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J.  Malouf, Jr.  - 09/11/2017                                      Pages 42..45

Page 42

1        (Exhibit 8 was marked.)
2   BY MR. MILLER:
3        Q    The first series of photos are those that
4   were taken at the September 4, 2014 inspection at
5   Dan Stubblefield's garage.  And then Exhibit 2 of
6   Exhibit 8 are photographs taken at the May 13, 2016
7   inspection at the Applied Technical Services
8   facility in Marietta, Georgia.  And did you observe
9   the scuff marks on the tires at any time?
10       A    I think I did at the -- at that
11   inspection, yes.
12       Q    At the May 13, 2016 inspection?
13       A    Yeah, in Atlanta.
14       Q    Did you see the scuff marks the day that
15   Preston Lind tested the motorcycle?
16       A    I don't recall.
17       Q    Do you agree that those scuff marks were
18   caused by Preston Lind's test riding?
19       A    I do.  Well, wait a minute.  I agree that
20   the back tire, Number 15 -- the front tire, I still
21   can't see -- I -- I can't see what Todd Hoover is
22   seeing with the front tires.  But the back tires
23   was -- was evident, yes.  I'm not saying it -- I'm
24   just saying I can't see what Todd Hoover is seeing.
25       MR. MALOUF, SR.:  And I'm going to object

Page 43

1   unless you're asking him as an expert or just
2   casual observing, you know.
3        MR. MILLER:  I'm just asking him when he
4   observed the scuff marks on the tires.
5        MR. MALOUF, SR.:  Well, he has answered
6   that.  On May 13th, he said, 2016.
7   BY MR. MILLER:
8        Q    So you disagree that there's scuff marks
9   on the front tire caused by Preston Lind's driving?
10       A    No, I don't disagree.  I just --
11       MR. MALOUF, SR.:  And, understand, if I
12   answer -- understand his question, that's not
13   to say he agrees.  He doesn't agree or
14   disagree.  He doesn't know, is my
15   understanding, so I don't want any
16   misconceptions here.
17       A    If there are any tire marks on that -- if
18   there are any marks on that front tire that were not
19   in the photographs at our inspection when it was
20   preserved by your experts, any additional marks on
21   the front tire would have been done by Preston.  So
22   I would agree with that.
23   BY MR. MILLER:
24       Q    And you would agree that what Preston Lind
25   was doing was testing the motorcycle and the brakes?

Page 44

1        A    No.  I mean -- I was trying to analyze
2   whether or not it was working.  Was it a scientific
3   testing, no, it was not.  It was a general
4   motorcycle rider, does this -- do these brakes
5   function as they should?  We had a statute of
6   limitations coming up.  I had to know an answer
7   immediately.  And the representatives -- the
8   representations made by your experts saying that
9   there was nothing wrong with the bike, I -- I just
10   didn't agree with that, but I wanted to make sure
11   before I filed this lawsuit.
12       Q    Well, after you filed the lawsuit, the
13   parties were required to submit initial -- what's
14   called initial disclosures, and you on behalf of the
15   plaintiffs submitted initial disclosures on
16   October 28, 2015, and did not list Preston Lind as a
17   witness; is that correct?
18       A    That's correct.
19       Q    And also, you responded to interrogatories
20   on February 12, 2016, and you did not list Preston
21   Lind as a witness there either, did you?
22       A    That's right.  I don't think he's a
23   witness.  He's an undisclosed consultant and I think
24   he's protected.  I don't think any of his
25   opinions -- I think all of his opinions are

Page 45

1   protected.
2        Q    Well, you said that you didn't pay
3   Mr. Lind the $20 for the one hour driving because
4   you anticipated some further testing; is that
5   correct?
6        A    Yes.
7        Q    Did you ever contact him again after this
8   test riding?
9        A    No.  It took about a year for y'all --
10   everybody to get served, everything to get done.
11   And so, I mean, it was a long period of time.  And
12   then after that, I ended up finding what I thought
13   was a better expert, so I had no reason to contact
14   him.  Well, other than if we were going to do the
15   testing in Jackson, he was going to do that.
16       Q    In your letter of August 2, 2016, that's
17   attached as Exhibit 7, you say, "On May 12, 2016,
18   the motorcycle battery was replaced and the
19   motorcycle was cranked and fitted with a stop gap on
20   the front brake lever to prepare for proposed
21   functional testing on May 13th.  The bike was
22   operated by Michael Malouf, Jr. approximately
23   100 yards at 15 to 25 miles per hour.  The front
24   brake did not engage, no scuffs on the front or back
25   tires were created.  No notes, video, or data was

Ex. A-13

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                    Pages 46..49

Page 46

1  collected."  So at the Applied Technical Services
2  facility in Marietta, you rode the bike on May 14 --
3  I mean May 13, --
4      A   Briefly.
5      Q   -- 2016.  Tell me what you did.
6      A   We -- we decided -- as you know, it was
7  last minute -- to try to do the functional testing.
8  We were trying to make sure -- we had limited time.
9  I wanted to make sure that we had everything
10  prepared.  The question was whether or not we had
11  adequate space to do this.  And so we had no idea
12  how long it would take to get the bike up to 15 to
13  20 miles per hour, and so I did that to see what
14  type of spacing.  We decided that we didn't have
15  enough space, and then the -- the testing didn't go
16  forward that day anyhow, so -- that following day.
17      Q   All right.  When you rode the bike, did
18  anybody else ride the bike that day?
19      A   No.
20      Q   When you rode it, did you squeeze the
21  front brake lever when you were cranking the engine?
22      A   I doubt it.
23      Q   And how many times did you operate the
24  front brake lever that day?
25      A   Maybe twice.

Page 47

1      Q   And what -- what was the response you got
2  from the front brake lever?
3      A   Well, I put it in position six, because I
4  knew that would be the only amount of pressure
5  available.
6      Q   That's the maximum?
7      A   The maximum distance.
8      Q   Distance?  Okay.
9      A   Let me say this.  I'm sorry.  I have no
10  idea what levers were on there so I don't know if it
11  was position one or position six.  I know it was the
12  furthest position.
13      Q   All right.  Was this the aftermarket
14  levers or the original equipment levers?
15      A   It was -- all that is well documented.
16      Q   What happened when you applied the
17  brake -- front brake lever?
18      A   Same thing that -- that happened every
19  time it's been applied from the first inspection all
20  the way to the last inspection.  To my observance,
21  it was the exact same pressure that was there on --
22  throughout all the inspections.
23      Q   I mean, did the brake lever touch the
24  grip?
25      A   Yes.

Page 48

1      Q   Was any brake force achieved?
2      A   There was some.  Minimal brake
3  force.  Same thing that was observed in all of the
4  testing.  But, again, I was not there to apply
5  braking.  The question was was there space to run a
6  test.  The braking was going -- testing was going to
7  occur the next day, which did not end up occurring.
8      Q   Have you ever had a case where ASTM
9  standards were an issue or part of the case?
10      A   Not -- as I sit here today, I don't -- I
11  don't believe so.
12      Q   The standard E 1188-05 titled Standard
13  Practice for Collection and Preservation of
14  Information and Physical Items by a Technical
15  Investigator, and subparagraph 4.2 says, "Obtain and
16  preserve physical items as early as possible.  Plan
17  the investigation to protect physical evidence
18  significant to the incident.  The plans should
19  consider possibility of identity loss, physical
20  loss, deterioration or destruction of information
21  due to environmental effect, or recovery and
22  collection activities.  When physical items cannot
23  be preserved in their found state, document it."
24  You would agree with that, wouldn't you?
25      A   Yeah.  And that was done.  That's exactly

Page 49

1  what y'all did when y'all came in 2014.  A video,
2  they recorded, they tested the pressure.  Suzuki did
3  all of that back in 2014.  That's exactly what they
4  did.
5      Q   All right.  And then the next standard
6  that's attached to the letter is E 860-97, Examining
7  and Preparing Items That Are or May Become Involved
8  in Criminal or Civil Litigation.  And its Section
9  4.2 says, "If proposed tests, examinations, or other
10  actions are likely to alter the nature, state, or
11  condition of the evidence so as to preclude or limit
12  additional examination and testing, the person,
13  firm, or corporation planning to perform the
14  proposed actions shall:
15          First, "Notify its client that the
16  proposed action is likely to alter the nature,
17  state, or condition of the evidence so as to
18  preclude or limit additional examination or testing
19  of the evidence."
20          And the next item is, "Recommend that
21  its client notify other interested parties of the
22  proposed action described in 4.2, and recommend to
23  its client that other interested parties be given
24  the opportunity to participate in the procedures
25  described in 4.1 or to witness and record any such

**Ex. A-14**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                    Pages 50..53

Page 50

1 actions."
2     A    We did that. I presented all that
3 information to you and nothing that we did was
4 likely. I'm using your words, I'm not reading it in
5 front of me, but you said, is it likely to alter?
6 No, it was not likely to alter. Nothing we did was
7 likely to alter or change the evidence in any
8 manner. And as we sit here today, there's nothing
9 been changed with regard to the front brake.
10    Q    But you agree you did not invite any
11 representative of Suzuki Motor Corporation or
12 representative of Nissin Kogyo to the test riding
13 performed by Preston Lind?
14    A    I did. I invited y'all in my April
15 letter. I invited y'all to come do an inspection,
16 do riding, take apart the front brake master
17 cylinder, do all of that. And Suzuki said they were
18 done, they had got all the information they needed,
19 they preserved the bike, and Suzuki said they didn't
20 want to do any additional testing. And that's what
21 was personally told to me, and both you and
22 Mr. Jicka were there when all that was made in the
23 presence of, what, five experts that were there on
24 behalf of Suzuki and Nissin.
25    Q    But after the September 4, 2014,

Page 51

1 pre-litigation examination, you received the letter
2 that's marked as Exhibit 4 from Suzuki Motor
3 Corporation asking that a representative be present
4 if you do any further inspection or testing; right?
5     A    That was not going to be possible.
6     Q    Why is that?
7     A    Because I had a statute of limitations
8 within the month. It took y'all seven months to get
9 there and y'all already stated that you did not want
10 to do any additional testing. Y'all should have
11 done more testing. Y'all had -- y'all were supposed
12 to take apart the master cylinder. There was
13 supposed to be a lot of additional testing that
14 Suzuki said no, we're done, we don't want to
15 participate in any other testing. That's what was
16 said at that date.
17    Q    And Mr. Mark Jicka sent you a letter dated
18 October 21, 2014, attached as Exhibit 5. It says,
19 "If you decide to continue with this claim and file
20 suit, please preserve the motorcycle in its current
21 condition. And if you plan to do any further
22 inspection or testing of the motorcycle, please give
23 us prior notice so we can have an opportunity to be
24 present." Is that correct?
25    A    I think I complied with both of those.

Page 52

1     Q    Are you sure you didn't take any photos on
2 the Preston Lind testing day?
3     A    Yes.
4     Q    Did either you or Preston Lind prepare any
5 sort of protocol for that testing?
6     A    No. There was no protocol. It was -- it
7 was going to be a very subjective opinion by him,
8 whether or not the brakes were properly working.
9 There was no protocol. It was --
10    Q    Was Mr. Lind wearing riding gloves during
11 the testing?
12    A    He was in full gear. I believe he was
13 riding -- I'm sure he was, yes.
14    Q    Do you know what kind of gloves he was
15 wearing?
16    A    No.
17    Q    Do you know how he had his hand on the
18 front brake lever?
19    A    No. This was not done to simulate. This
20 was not done to recreate. It was not done for any
21 other purpose other than to validate Suzuki's
22 opinions that the brakes were perfectly working at
23 the end of their inspection. I wish Suzuki had been
24 more forthcoming with their investigation at that
25 time. This would not have been necessary.

Page 53

1     Q    After the Preston Lind testing at the JFC
2 complex, you took the bike back on the trailer
3 to the warehouse on South State Street?
4     A    Yes.
5     Q    And it stayed there until you took it to
6 Marietta, Georgia?
7     A    Yes.
8     Q    Was it cranked at all between the time
9 when it was in the warehouse --
10    A    It was.
11    Q    -- before you took it to Marietta?
12    A    Yes.
13    Q    How many times was it cranked?
14    A    Maybe twice.
15    Q    And did you do that?
16    A    Yes, I think I did.
17    Q    Okay. Did you operate the front brake
18 lever at any time --
19    A    No.
20    Q    -- when it was in the warehouse?
21    A    (Witness shaking head in the negative.)
22        MR. MALOUF, SR.: Let him finish asking
23 the question.
24        THE WITNESS: Oh, I'm sorry. Go ahead.
25 Finish your question.

**Ex. A-15**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J.  Malouf, Jr.  - 09/11/2017                                    Pages 54..57

Page 54

1  BY MR. MILLER:
2      Q    Did you operate the front brake lever when
3  it was in the warehouse after the Preston Lind
4  riding and the time you took it to Marietta?
5      A    I did not, no.
6          MR. MILLER:  Let me take a brief break
7      here.
8          (A short break was taken.)
9          MR. MILLER:  Y'all ready to go back on the
10     record?
11         MR. MALOUF, SR.:  Yes, sir.
12 BY MR. MILLER:
13     Q    Mike, I have a few more questions.
14     A    Sure.
15     Q    When you observed the parking lot testing
16 in the time that Preston Lind was able to lock up
17 the front wheel, did that occur on the chip seal or
18 on the asphalt?
19     A    Chip seal mostly.  I don't know that he
20 did anything on the regular asphalt, and I don't
21 want -- Preston Lind's riding was very similar, I
22 guess, to the subsequent riding we all observed out
23 there with regard to what happened during the first
24 several rides.  It just -- I -- there's no -- I
25 don't -- you keep saying lock up.  It -- like I

Page 55

1  said, -- but the stuff that he was doing was on the
2  chip seal.
3      Q    I'm going to show you an e-mail on Friday,
4  July 29, 2016.
5          THE COURT REPORTER:  Do you want this 9?
6          MR. MILLER:  Yeah.  This will be the next
7      exhibit, 9.
8          (Exhibit 9 was marked.)
9  BY MR. MILLER:
10     Q    And you sent an e-mail to me, saying --
11 and copied others -- "Pursuant to the Court Order
12 today, the consultant that drove the subject
13 motorcycle is Mr. Preston Lind.  His number is
14 850-255-0007.  I will try to get in touch with him
15 today to set up a deposition ASAP.  Because he is
16 considered a consultant, I do not agree to any
17 ex-parte communication."
18          And so do you remember the telephonic
19 hearing with Judge Anderson that led to her ordering
20 that the participants in this testing be deposed?
21 Do you recall that hearing on the telephone?
22     A    In general.
23     Q    And do you recall that you could not
24 remember Mr. Lind's name at that hearing?
25     A    That would not be unusual, I guess.  I

Page 56

1  don't know.
2      Q    And then you e-mailed me and said you were
3  unable to reach him, you haven't spoken to him in
4  about two years, and you authorized me to have an
5  investigator locate him and that sort of thing.  And
6  then it turns out that he passed away in May of
7  2016, I believe.  Did you ever learn about his
8  passing?
9          MR. MALOUF, SR.:  At what point?  You
10     said, "Did you ever learn about his passing?"
11     Of course he has learned.
12         MR. MILLER:  Yeah.
13         MR. MALOUF, SR.:  What time point are you
14     making?
15     A    Yeah.  I heard he -- I heard he committed
16 suicide.  So that's -- I don't ask many questions
17 after that.
18 BY MR. MILLER:
19     Q    Apparently, one of your relatives,
20 Mitchell Malouf, attended the -- either the funeral
21 service or visited at the funeral home.  Is Mitchell
22 Malouf a cousin?
23     A    He's an uncle -- it's possible.  I've got
24 a Mitchell Malouf and Mitchell Malouf, Jr.  One is
25 an uncle.  One is a cousin.

Page 57

1      Q    Okay.  Did you ever talk to Mitchell
2  Malouf about Preston Lind or did you know that they
3  knew each other?
4      A    I think at the deposition y'all informed
5  me of that.  I didn't know.
6      Q    And you were present, were you not, for
7  the deposition of Jennifer Lind?
8      A    Yeah.
9      Q    And you reviewed the affidavit that
10 Jennifer Lind submitted to the Court?
11     A    I think you gave it to me the day of her
12 deposition.  I don't know why it wasn't produced
13 earlier but...
14     Q    And in her deposition and in her
15 affidavit, Jennifer Lind said words to the effect
16 that whoever was riding the bike did not know what
17 they were doing because there's nothing wrong with
18 it.  Do you recall that?
19     A    I recall that.  I do.  I -- she has no
20 basis for that statement whatsoever, which is of
21 course why it would be hearsay.  And I think your
22 experts would disagree with that as well and they
23 have disagreed with it.
24         MR. MALOUF, SR.:  Is this an exhibit,
25     Bobby, or are you just asking about that?

844.533.DEPO

**Ex. A-16**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J.  Malouf, Jr.  - 09/11/2017                                       Pages 58..61

Page 58

1        MR. MILLER:  Just asking the question.
2        MR. MALOUF, SR.:  Okay.  Not the exhibit
3   -- I'm talking about the e-mail.  I just want
4   to make sure.
5        MR. MILLER:  Yeah.  Yeah.  It's Exhibit 9.
6        MR. MALOUF, SR.:  Okay.
7   BY MR. MILLER:
8        Q   So do you think Jennifer Lind just made
9   that up, that she recalled Preston saying that
10  following the test ride he told Mr. Malouf that
11  whoever wrecked the bike obviously did not know how
12  to ride because there was nothing wrong with the
13  motorcycle?
14       A   I think everything Ms. Lind testified to
15  was not truthful.  It was not accurate.  And I think
16  she was distraught over her son.  And I -- I don't
17  think she was clearly thinking.  And I don't think
18  Preston was -- you know, I don't think he said those
19  things at all to her.
20       Q   Well, she also said that Mr. Malouf never
21  paid Preston for the test riding the motorcycle.
22  And that's true, though, isn't it?
23       A   That would be -- that's -- that's half
24  true, but yes.
25       MR. MILLER:  I'm going to pass the

Page 59

1   witness.
2        MR. JICKA:  I've got no questions.
3        MR. MALOUF, SR.:  Gentlemen, it's been a
4   pleasure.
5        THE WITNESS:  Well, I mean, --
6        MR. MALOUF, SR.:  Do you want to take a
7   break?
8        THE WITNESS:  No.  I'm just making sure I
9   answered all his questions.  We'll take a
10  two-second break.
11       MR. MILLER:  Okay.
12       (A short break was taken.)
13       MR. MALOUF, SR.:  Let me ask just a couple
14  of questions to maybe clarify position.
15       EXAMINATION
16  BY MR. MALOUF, SR.:
17       Q   Mike, Mr. Miller has asked you quite a few
18  questions about the day Preston Lind rode the
19  motorcycle, and I think you testified that earlier
20  that I think in September 2014, they had had a
21  pre-litigation inspection, both Nissin and Suzuki.
22  Based upon what you observed Preston Lind, was there
23  any different operation of the brakes when Preston
24  Lind operated as when the pre-litigation inspection
25  or the subsequent inspection of the brakes?

Page 60

1        A   Based on my observation and based on the
2   testing that all the experts have done, the brake
3   has performed the exact same throughout their very
4   first inspection in 2014 all the way to the
5   inspection of 2017.  Based on my observation and
6   everything that I've seen, the brakes have always
7   done the exact same.  There's been no altering or
8   deviation in the performance of the brakes.  They've
9   had the same performance from when they preserved
10  the evidence back in 2014 until the most recent
11  taken apart in 2017.
12       Q   Okay.  And let me ask you this.  Would
13  that also include when Preston Lind rode the bike?
14       A   The day he rode the bike, what I observed
15  him pulling was the exact same condition of the bike
16  and the exact same condition it is now.  With regard
17  to the ability of it stopping was the exact same
18  thing that we observed in the -- in the following
19  ride test.  There's no difference.
20       Q   Okay.  Now, when was the date of the
21  accident, as you recall?
22       A   It was, what, two thousand --
23       Q   January 2012?
24       A   Yeah.
25       Q   And their pre-litigation inspection was

Page 61

1   what month?  Do you remember?
2        A   September 2014, so that would be the most
3   accurate of anything that's been done.
4        Q   Okay.  And when was it that Preston Lind
5   rode it?  Was it in November 2014?
6        A   It was a couple of weeks after -- a couple
7   of weeks or so after -- after their -- after this
8   inspection by Suzuki and N.K.
9        Q   Couple of weeks or couple of months, you
10  think?  If they did theirs in September, --
11       A   Oh, yeah, it would have been more than a
12  couple of weeks.  So, yeah.
13       Q   Okay.  And you had -- they had asked you
14  about I think Exhibits maybe 2 and 3 and 4 about
15  preservation letter.  Did you do anything to violate
16  the preservation that they requested?
17       A   No.  It was properly preserved.  That's
18  exactly the purpose of them coming in there to do
19  any and all testing.  And that's what was done, so
20  there's been no change in the master cylinder, no
21  change in the brakes.  There's been no change
22  whatsoever in the evidence.  So that's it.
23       MR. MILLER:  Okay.
24       THE WITNESS:  Thank you.
25       MR. THOMAS:  Bobby, one thing.

**Ex. A-17**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J.  Malouf, Jr.  - 09/11/2017                                                    Pages 62..65

Page 62

```
1     (Off-the-record discussion.)
2      (A short break was taken.)
3   MR. MILLER:  We have no further questions.
4   THE WITNESS:  All right.  Thank you guys.
5      (Deposition concluded.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 63

```
1               CORRECTIONS AND SIGNATURE
2
3   PAGE/LINE     CORRECTION        REASON FOR CHANGE
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

Page 64

```
1   I, MICHAEL J. MALOUF, JR., ESQ, have read the
2   foregoing deposition and hereby affix my signature
3   that same is true and correct, except as noted
4   above.
5   _____
6   MICHAEL J. MALOUF, JR., ESQ
7   THE STATE OF _____)
8   COUNTY OF _____)
9   Before me, _____, on this day
10  personally appeared MICHAEL J. MALOUF, JR., ESQ,
11  known to me (or proved to me  under oath or other
12  document) to be the person whose name is subscribed
13  to the foregoing instrument and acknowledged to
14  consideration therein expressed.
15  Given under my hand and seal of office this _____
16  day of _____ A.D., 2017.
17
18  _____
19  NOTARY PUBLIC IN AND FOR
20  THE STATE OF _____
21  My Commission Expires: _____
22
23
24
25
```

Page 65

```
1               REPORTER'S CERTIFICATE
2      DEPOSITION OF MICHAEL J. MALOUF, JR., ESQ
3               SEPTEMBER 11, 2017
4      I, Melinda K. Bowers, Certified Court
    Reporter and Notary at Large in and for the State of
5   Mississippi, do hereby certify that the foregoing
    pages, and including this page, contain a true and
6   correct transcript of the testimony of the witness,
    as taken by me at the time and place heretofore
7   stated in the aforementioned matter, by machine
    shorthand with electronic verification, with the
8   assistance of computer-aided transcription, to the
    best of my skill and ability.
9      I further certify that I placed the
    witness under oath to truthfully answer all
10  questions in this matter under the authority vested
    in me by the State of Mississippi.
11
       I further certify that I am not in the
12  employ of, or related to, any counsel or party in
    this matter, and have no interest, monetary or
13  otherwise, in the final outcome of the proceeding.
14     Witness my seal and signature on this 4th
    day of October, 2017.
15
16
17  Melinda K. Bowers, CCR 1556
    Notary Public #57665
18  My Commission Expires: October 24, 2019
19
20
21
22
23
24
25
```

**Ex. A-18**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J.  Malouf, Jr.  - 09/11/2017                                              Index: $20..Absolutely

**Exhibits**

**exhibit 1**  3:14 6:15

**exhibit 2**  3:15 6:16, 24 42:5

**exhibit 3**  3:16 6:21, 25 7:3

**exhibit 4**  3:17 18:9, 10 51:2

**exhibit 5**  3:18 19:23 51:18

**exhibit 6**  3:19 21:6, 7

**exhibit 7**  3:20 36:1, 2 45:17

**exhibit 8**  3:21 41:25 42:1,6

**exhibit 9**  3:22 55:8 58:5

---

**$**

**$20**  26:9 45:3

---

**-**

**-numbered**  1:20

---

**1**

**1**  1:13 3:14 6:15,20

**1-5**  1:7

**10**  10:4

**100**  45:23

**1020**  1:24 5:12

**11**  1:12 34:2,5 35:6

**1188-05**  48:12

**11th**  1:21 5:14

**12**  44:20 45:17

**13**  36:21 42:6,12 46:3

**13th**  43:6 45:21

**14**  46:2

**1400**  1:24 2:22 5:13

**15**  42:20 45:23 46:12

**17**  3:17 18:4

**1970**  11:13

---

**2**

**2**  3:15,20 6:16,20, 24 34:1 35:22 42:5 45:16 61:14

**2.7**  35:13 39:16

**2.8**  39:16

**20**  9:8,22 46:13

**2012**  16:10 60:23

**2014**  16:16,23 18:4 19:14 25:19 29:9 36:12,21 42:4 49:1, 3 50:25 51:18 59:20 60:4,10 61:2, 5

**2014...............18**  3:17

**2014...............19**  3:18

**2015**  20:21 21:13 44:16

**2015.................21**  3:19

**2016**  35:22 36:6,14, 22 42:6,12 43:6 44:20 45:16,17 46:5 55:4 56:7

**2016.................55**  3:22

**2016.................36**  3:20

**2017**  1:12,21 5:14 7:21 8:1,4 60:5,11

**21**  3:18 19:14 51:18

**25**  15:7 45:23

**28**  36:6 38:3 44:16

**29**  3:22 55:4

**2:00**  30:6

---

**3**

**3**  3:16 6:21,25 7:3 61:14

**30**  3:19 14:23 16:1 20:21 32:7,18 38:3

**30080**  2:8

**35**  32:18

**39157-8719**  2:23

**39201**  2:5,12,17

**3:15CV18HTW-LRA**  1:5

---

**4**

**4**  3:17 16:16 18:9, 10 25:19 29:9 36:14,21 42:4 50:25 51:2 61:14

**4.1**  49:25

**4.2**  48:15 49:9,22

**40**  32:7

**400**  2:17

---

**5**

**5**  3:18 10:4 19:23 51:18

**501**  2:12

---

**6**

**6**  3:19 21:6,7

---

**7**

**7**  3:20 36:1,2 45:17

---

**8**

**8**  3:21 41:25 42:1,6

**850 225-0007**  27:7

**850-255-0007**  55:14

**856**  28:19 36:13

**860-97**  22:10 49:6

---

**9**

**9**  3:22 55:5,7,8 58:5

**9:33**  5:15

---

**A**

**a.m.**  5:15

**ability**  60:17

**above-styled**  1:20

**Absolutely**  41:9

**Ex. A-19**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                    Index: accident..brakes

**accident** 8:21 16:9 23:4 31:22 33:4,13, 15 36:10 60:21

**accordance** 4:8,22

**account** 28:1,4

**accurate** 58:15 61:3

**achieved** 48:1

**action** 1:5 49:16,22

**actions** 49:10,14 50:1

**activities** 22:19 48:22

**add** 26:15

**additional** 43:20 49:12,18 50:20 51:10,13

**adequate** 46:11

**adequately** 31:25

**affect** 17:19

**affidavit** 3:21 41:24 57:9,15

**aftermarket** 33:3 47:13

**agree** 12:2 21:16 22:13,23 23:6 26:3, 8 35:5 42:17,19 43:13,22,24 44:10 48:24 50:10 55:16

**agreed** 26:9

**agrees** 43:13

**ahead** 33:19 53:24

**air** 11:1

**alter** 22:20 49:10, 16 50:5,6,7

**alterations** 23:5

**altered** 23:3

**altering** 22:16,21 60:7

**altogether** 26:15

**America** 10:24

**amount** 47:4

**analyze** 16:20 44:1

**Anderson** 55:19

**anticipated** 45:4

**Apparently** 56:19

Appearances........... ...............................2 3:3

**applicable** 4:9,12, 22

**applied** 36:16 39:16 42:7 46:1 47:16,19

**apply** 32:17 33:6 48:4

**applying** 31:11 34:17

**approximately** 5:15 45:22

**April** 16:18 50:14

**area** 21:22

**ASAP** 55:15

**asphalt** 31:2 54:18, 20

**assistance** 32:15

**assume** 30:6

**ASTM** 21:9 22:2 48:8

**Atlanta** 2:7 42:13

**attach** 6:15 41:22

**attached** 8:15 21:10 41:23 45:17 49:6 51:18

**attended** 56:20

**attorney** 16:8

**attorneys** 4:3 11:7, 16

**August** 3:20 8:3 35:22 45:16

**authorized** 56:4

**automobile** 10:5

**automobiles** 11:17

**average** 15:20

**aware** 8:17 23:15 27:1 29:14

**Ayers** 11:6

**B**

**back** 13:1 15:19 16:17 17:4 26:14 32:17 40:19,25 41:15 42:20,22 45:24 49:3 53:2 54:9 60:10

**background** 9:11 25:1

**bag** 11:1

**based** 19:11 25:9 59:22 60:1,5

**basis** 11:24 57:20

**battery** 45:18

**behalf** 11:15,25 44:14 50:24

**belief** 19:9

**bike** 16:19,20,22 19:9 28:14 29:17 30:12,20 31:7,11 32:9,11,16,20 36:11 37:7 40:1,7 41:7,13 44:9 45:21 46:2,12,17,18 50:19 53:2 57:16 58:11 60:13,14,15

**bikes** 14:14 34:12

**Black** 18:5

**Bless** 21:24

**Bobby** 15:7 57:25 61:25

**bobby.miller@ butlersnow.com** 2:23

**Bowers** 1:21 4:6,16 5:8

**Bradley** 1:3 16:10 31:22

**brake** 15:17,19,21 17:13,14,16,19,21, 25 20:1,2 30:16,17 32:10,13,20,22,25 33:3,4,11,22 34:4, 11,18 35:17,19 36:23 37:8,16 38:2, 4 39:16 40:19 41:15 45:20,24 46:21,24 47:2,17, 23 48:1,2 50:9,16 52:18 53:17 54:2 60:2

**brakes** 15:22 31:10,12,25 32:18 33:7,25 35:3,6 40:15,18,21,24,25

**Ex. A-20**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J.  Malouf, Jr.  - 09/11/2017                                    Index: braking..Corrections.........

41:4,10,17 43:25
44:4 52:8,22 59:23,
25 60:6,8 61:21

**braking** 15:18
33:24 37:23 39:2
48:5,6

**break** 54:6,8 59:7,
10,12 62:2

**Briefly** 46:4

**bring** 7:6,8

**bunch** 14:24

**business** 36:16

**Butler** 1:23 2:22
5:12 9:2

**buy** 15:1

————————

**C**

————————

**C-spire** 27:25

**call** 8:2,3 24:2

**called** 24:3 31:3
44:14

**calling** 27:18

**calls** 26:21,24 27:4

**capable** 20:3 34:19

**Capitol** 2:4,12,17

**car** 40:13

**Caroline** 2:16

**Carrington** 20:20

**case** 9:24 10:2,15,
20,24 11:3,23 16:9
48:8,9

**cases** 10:10 12:4,6,
11,12,17,18 22:5
23:9,13

**casual** 43:2

**Cathi** 18:5

**caused** 42:18 43:9

**CCR** 1:22 4:6,17
5:8

**cell** 27:12,24

**Certificate...............
.............65** 3:9

**certification** 4:16

**certify** 5:9

**chain** 7:10 8:20
36:4,7

**chair** 10:21,22

**change** 29:13
32:22 50:7 61:20,
21

**changed** 23:3
32:25 34:5 37:8
50:9

**charge** 11:22

**child** 24:13,19

**childhood** 24:15

**chip** 31:3,13 54:17,
19 55:2

**choose** 18:13

**City** 1:25

**civanov@
watkinseager.com**
2:18

**civil** 1:5 4:10,13,23
5:10 6:9 9:17,20
49:8

**claim** 11:21 18:14
20:5 51:19

**claims** 11:12,15,17

**clarify** 59:14

**class** 14:21

**clear** 19:6

**client** 18:13 49:15,
21,23

**clients** 11:12,15
22:14 23:2

**close** 38:13,17,18

**Club** 29:16

**Cochran** 2:7

**collected** 46:1

**collection** 48:13,22

**college** 13:7 16:2

**Colony** 1:24 2:22
5:13

**comfortable** 32:12,
17 37:7

**commencing** 5:15

**comment** 17:9

**comments** 17:3,5,7

**Commissioner** 4:6
5:8

**committed** 56:15

**communication**
55:17

**comp** 10:5,20

**company** 1:7 12:7

**compare** 25:10

**competent** 12:3,5,
10

**complete** 40:7

**complex** 28:10

**29:17 53:2**

**complied** 51:25

**concluded** 62:5

**condition** 15:10
18:15 20:7 22:20
49:11,17 51:21
60:15,16

**conducted** 23:17

**considered** 55:16

**consultant** 44:23
55:12,16

**contact** 24:1,5
25:14 45:7,13

**contacted** 23:24

**contacting** 27:21

**contemplate** 22:15

**contingency** 11:24

**continue** 18:13
20:5 51:19

**contrary** 41:9

**conversation** 17:18

**copied** 55:11

**copy** 6:23 21:1,2

**Corp** 1:6,19 2:20

**corporation** 1:6
49:13 50:11 51:3

**CORPORATIONS**
1:7

**correct** 10:25 16:12
18:1 25:23 36:17
44:17,18 45:5
51:24

**Corrections.............
.............63** 3:8

**Ex. A-21**

**counsel** 5:11

**counting** 9:24

**County** 4:7

**couple** 10:10 59:13
61:6,9,12

**Court** 1:1 5:4,9 6:7
21:25 36:5 55:5,11
57:10

**cousin** 56:22,25

**crank** 29:12

**cranked** 45:19
53:8,13

**cranking** 46:21

**created** 45:25

**criminal** 9:18 49:8

**cross-country**
13:22

**curious** 11:5

**current** 18:15 20:7
51:20

**custodian** 5:3

**custody** 7:11 8:19,
20 36:5,7

**cylinder** 50:17
51:12 61:20

**D**

**Dan** 7:18,19,24,25
8:12,13 28:13 29:3,
22 30:1 36:10 42:5

**Dan's** 8:6

**dangerous** 11:14

**data** 45:25

**date** 5:9 8:21 18:6

36:9 51:16 60:20

**dated** 3:17,18,19,
20,22 18:4 19:14
20:20 35:22 51:17

**David** 11:6

**day** 1:21 9:2 24:20
28:6,7 30:5,7,8
34:9 42:14 46:16,
18,24 48:7 52:2
57:11 59:18 60:14

**decide** 20:5 34:14
51:19

**decided** 46:6,14

**defective** 11:20
19:9

**Defendant** 1:19
2:14,20

**DEFENDANTS** 1:7

**delivered** 5:2

**deposed** 55:20

**deposition** 1:10,17
3:12 4:4,8,14,19
6:6,11,18,19 7:20,
22 8:2,10,16,18,24
9:3,4,6 24:20 55:15
57:4,7,12,14 62:5

**Deposition...............
..........6** 3:15

**describe** 36:6

**description** 36:19

**designated** 22:9

**destroyed** 7:16

**destruction** 48:20

**detail** 23:4

**deterioration** 48:20

**determine** 11:22

**determined** 20:1

**deviation** 60:8

**die** 14:2

**difference** 35:18
60:19

**direct** 5:4

**directions** 30:12

**dirt** 14:14

**disagree** 43:8,10,
14 57:22

**disagreed** 57:23

**disassembling**
22:17

**disclosures** 44:14,
15

**discussing** 33:17

**discussion** 62:1

**disposing** 22:16

**distance** 39:21,22
47:7,8

**distraught** 58:16

**DISTRICT** 1:1

**DIVISION** 1:2

**document** 48:23

**documented** 47:15

**documents** 7:7,8,9,
10

**doubt** 46:22

**Downtown** 28:5

**drive** 32:11

**driver's** 13:12

**driving** 43:9 45:3

**drove** 14:1 55:12

**drug** 40:5

**drugs** 11:19

**dry** 21:21 30:9

**duces** 7:3

**due** 48:21

**duly** 1:19 6:2

**duration** 39:21

**E**

**e-mail** 3:22 7:19,21,
23 8:13,15 26:18
55:3,10 58:3

**e-mailed** 56:2

**e-mails** 7:13,24
8:11

**Eager** 2:16 19:15

**earlier** 7:9 33:8
57:13 59:19

**early** 48:16

**East** 2:4,12,17

**Edwards** 2:6,7

**effect** 48:21 57:15

**end** 26:2 32:23
40:12 41:1 48:7
52:23

**ended** 45:12

**endorsement**
13:11

**ends** 38:23,24 39:1

**engage** 45:24

**engaged** 37:16

Ex. A-22

38:3,4

**engaging** 22:19
40:16

**engine** 46:21

**entire** 9:15

**environmental**
48:21

**equipment** 33:4
47:14

**Esq** 1:11,18 2:3,6,
11,15,16,21 3:5 4:5
5:3 6:1

**Estes** 10:11

**evaluate** 11:21
24:22 25:7

**eventually** 15:3

**evidence** 12:15
21:15 22:3,21 23:9,
13 48:17 49:11,17,
19 50:7 60:10
61:22

**evident** 42:23

**ex-parte** 55:17

**exact** 12:6 47:21
60:3,7,15,16,17

**examination** 3:6,7
4:4 5:16 7:1 49:12,
18 51:1 59:15

**examinations** 49:9

**examined** 6:4

**Examining** 49:6

**exhibit** 3:11,12
6:15,16,21,24,25
7:3 18:9,10,23
19:18,23 21:6,7
36:1,2 41:25 42:1,

5,6 45:17 51:2,18
55:7,8 57:24 58:2,5

**exhibits** 6:20 61:14

**Exhibit 5** 19:22

**expected** 24:24

**experience** 12:21
15:10 25:9

**experienced** 11:20
23:25

**expert** 43:1 45:13

**expert's** 36:16

**experts** 19:25
43:20 44:8 50:23
57:22 60:2

**E 1188-05** 22:10

_____

**F**

**face** 14:10

**facility** 42:8 46:2

**failed** 10:22

**familiar** 34:12

**father** 10:15

**February** 44:20

**Federal** 4:10,13,23
5:10 6:8

**fee** 11:24

**felt** 32:17 34:11
37:7

**field** 30:23

**figure** 27:18

**file** 20:6 51:19

**filed** 11:17 23:14
44:11,12

**filing** 4:18 5:3

**final** 38:3

**find** 27:22

**finding** 45:12

**fine** 15:14 26:16
40:19,20

**finish** 53:22,25

**firm** 11:11 12:2
49:13

**fitted** 45:19

**FJ1100** 13:2

**fluid** 34:4

**food** 11:18

**Football** 29:16

**force** 17:25 20:2
37:24 38:11 48:1,3

**foregoing** 5:11

**FOREIGN** 1:6

**form** 4:20

**forthcoming** 52:24

**forward** 25:13
46:16

**found** 48:23

**Friday** 55:3

**friend** 24:5,6

**friends** 14:24 16:4
23:20 24:5 27:21

**friends'** 15:25

**front** 15:17,20
17:25 20:2 30:16
31:24 33:10 37:15,
23 38:2,4,5 39:13,
16,19 40:9,10,21
41:3 42:20,22 43:9,

18,21 45:20,23,24
46:21,24 47:2,17
50:5,9,16 52:18
53:17 54:2,17

**full** 40:3 52:12

**function** 44:5

**functional** 20:3
45:21 46:7

**functioning** 41:10

**funeral** 56:20,21

**furniture** 11:18

**furthest** 47:12

_____

**G**

**gap** 45:19

**garage** 29:4 36:11
42:5

**gave** 9:4 57:11

**gear** 52:12

**general** 35:2 37:5
44:3 55:22

**gentleman** 17:11

**Gentlemen** 59:3

**Georgia** 2:8 36:15
42:8 53:6

**give** 9:3 18:17 20:9
30:11 32:15 41:5
51:22

**gloves** 52:10,14

**gravel** 33:13,18,22,
24

**grayish** 17:11

**grip** 47:24

**GSXR1000** 16:16

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                              Index: guess..kind

**guess** 14:20 15:3 24:13 25:9 36:25 54:22 55:25

**guidance** 30:11

**Guiding** 11:12

**guys** 21:17 62:4

---

**H**

**hair** 17:11

**half** 58:23

**hand** 40:3 52:17

**handle** 12:3,5,10

**handled** 11:14

**happen** 19:11 23:19 40:5

**happened** 40:5 47:16,18 54:23

**happening** 34:8

**He'll** 6:13

**head** 53:21

**heard** 56:15

**hearing** 55:19,21, 24

**hearsay** 57:21

**hereinafter** 4:19

**hereto** 4:3

**Highland** 1:24 2:22 5:13

**him/her** 4:15

**holds** 12:2

**home** 56:21

**honesty** 12:8

**Hoover** 30:24 37:25 38:14 41:24 42:21, 24

**Hoover.................... 42** 3:21

**hour** 26:9,13 32:7, 18 45:3,23 46:13

**hours** 14:18 26:10

**house** 29:6

**Huh-uh** 11:4 14:10 21:4

**HUSBAND** 1:4

**Hyatt** 7:10

---

**I**

**idea** 13:21 14:20 24:12 32:24 33:11, 16 39:18 46:11 47:10

**identity** 48:19

**immediately** 22:23 44:7

**important** 21:15

**incident** 48:18

**include** 60:13

**including** 22:21

**inconsistent** 19:1

**INDEX** 3:1,11

**information** 25:1 35:2 48:14,20 50:3, 18

**informed** 57:4

**initial** 44:13,14,15

**injured** 11:19

**injury** 11:16

**inspect** 16:19

**inspected** 16:23

**inspection** 16:15 18:3,16 19:2 20:8, 18 21:18 25:17,19 29:8 32:24 42:4,7, 11,12 43:19 47:19, 20 50:15 51:4,22 52:23 59:21,24,25 60:4,5,25 61:8

**inspections** 17:17 19:7,10 47:22

**instance** 1:18

**instrumentation** 34:15,23

**intent** 37:1

**interested** 49:21,23

**interrogatories** 44:19

**investigation** 48:17 52:24

**investigator** 48:15 56:5

**invite** 50:10

**invited** 50:14,15

**involve** 12:13

**involved** 10:9,18, 21,25 11:3 16:10 21:16 26:10,14 49:7

**involving** 11:17

**issue** 48:9

**item** 49:20

**items** 7:5 48:14,16, 22 49:7

**Ivanov** 2:16

---

**J**

**Jackson** 2:5,12,17 11:16 29:16 36:14 45:15

**January** 16:10 60:23

**Jeff** 7:10

**Jennifer** 24:9 57:7, 10,15 58:8

**JFC** 28:10 29:16 30:23 53:1

**Jicka** 2:15 11:2 19:15 35:22 50:22 51:17 59:2

**Jr** 1:11,17 2:3 3:5 4:5 6:1,6 28:2 45:22 56:24

**Judge** 3:14 6:16 11:8,9 55:19

**July** 3:19,22 20:21 21:12 36:6 55:4

**June** 8:1 21:12

**June-ish** 7:21

**justice** 11:21

---

**K**

**Kat** 20:19 21:20 22:11

**Kat's** 22:13

**kids** 24:12

**kind** 12:25 17:22 26:17 52:14

Ex. A-24

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                                      Index: knew..Michael

**knew** 23:21 24:11, 13 47:4 57:3

**Kogyo** 1:6 2:14 20:14 50:12

**KRISTAN** 1:3

**Kunz** 2:16

---

**L**

**language** 12:9

**lap** 37:13 38:3 40:23

**laps** 32:16 35:11 36:22 37:2,6

**Lauderdale** 4:7

**law** 4:3 9:12 11:13

**lawsuit** 44:11,12

**learn** 56:7,10

**learned** 56:11

**lease** 28:22

**led** 24:6 55:19

**length** 35:15

**letter** 3:17,18,19,20 7:9 16:17 18:4,12 19:14,16,18,25 20:16,20 21:9 22:13,25 23:1 25:22 33:8 35:21, 25 36:4,20 45:16 49:6 50:15 51:1,17 61:15

**letters** 23:9,13

**lever** 17:25 20:1 37:8 39:16 45:20 46:21,24 47:2,17, 23 52:18 53:18 54:2

**levers** 32:20,22,25 33:3,4 47:10,14

**liability** 1:7 9:21 10:6 11:15 12:4,6, 11,12

**license** 13:12

**limit** 49:11,18

**limitations** 44:6 51:7

**limited** 1:7 46:8

**Lind** 7:6,11,13,14 23:18,19 24:10,21, 22 25:2,26:3,19 27:6 28:7 29:9,17 30:11,20 31:21 32:9 33:6,21,25 34:9 35:9,11 37:12 38:22 39:15 40:15 41:6,20 42:15 43:24 44:16,21 45:3 50:13 52:2,4, 10 53:1 54:3,16 55:13 57:2,7,10,15 58:8,14 59:18,22, 24 60:13 61:4

**Lind's** 42:18 43:9 54:21 55:24

**lines** 34:16

**list** 44:16,20

**litigation** 9:14,17, 21 10:17 11:1 20:19 25:13 26:13 28:25 49:8

**locate** 56:5

**located** 28:14

**location** 30:23

**lock** 37:19,23 39:7, 9,12,20 54:16,25

**locked** 37:18 38:5,7 39:3,20 40:4,8

**locking** 38:13,15, 17,19

**lockup** 38:16 40:13

**long** 9:11 13:3,5,14 39:20 45:11 46:12

**loops** 34:10

**loss** 48:19,20

**lot** 31:1,2 35:16 51:13 54:15

**Lyon** 10:11

---

**M**

**machine** 1:23

**made** 17:3,5 19:2,5, 18 23:5 33:9 44:8 50:22 58:8

**main** 11:9

**make** 11:25 18:9,22 19:21 21:6 32:12 35:18,25 37:6 44:10 46:8,9 58:4

**making** 34:10 56:14 59:8

**Malouf** 1:11,17 2:3, 4,11 3:5,7 4:5 6:1, 6,23 9:24 10:1,15 11:8,13,14 13:8 15:6,11 18:22 28:2, 5 42:25 43:5,11 45:22 53:22 54:11 56:9,13,20,22,24 57:2,24 58:2,6,10, 20 59:3,6,13,16

**man** 23:17

**manner** 50:8

**March** 36:14

**Marietta** 36:15 42:8 46:2 53:6,11 54:4

**Mark** 2:15 19:14 35:22 51:17

**marked** 3:12 6:20, 25 18:10 19:23 21:1,3,7 36:2 42:1 51:2 55:8

**markings** 22:22

**marks** 42:9,14,17 43:4,8,17,18,20

**master** 50:16 51:12 61:20

**matter** 17:14

**maximum** 47:6,7

**means** 11:24

**measured** 20:1

**measurements** 17:25

**mechanics** 23:21 27:18

**meet** 24:9

**Melinda** 1:21 4:6,16 5:8

**meritorious** 11:23

**message** 26:18,20, 23

**messages** 27:2

**met** 30:24

**Michael** 1:11,17 2:3,11 3:5 4:5 6:1 28:1 45:22

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                              Index: middle..opportunity

**middle** 38:25

**Mike** 6:6,10 8:25
10:15 54:13 59:17

mike@malouflaw.
**com** 2:13

mikejr@malouflaw.
**com** 2:5

**miles** 13:19 14:4
32:7,18 35:14
39:17 45:23 46:13

**Miller** 2:21 5:3 6:5,
13,21 7:2 10:8
11:10 13:10 15:9,
14,15 18:9,11,24
19:3,21,24 21:2,4,
6,8,24 22:1 35:25
36:3 41:22 42:2
43:3,7,23 54:1,6,9,
12 55:6,9 56:12,18
58:1,5,7,25 59:11,
17 61:23 62:3

**Miller..................**7
3:6

**Mine** 27:25

**Minimal** 48:2

**minute** 42:19 46:7

**minutes** 14:23

**misconceptions**
43:16

**Mississippi** 1:1,22,
25 2:5,12,17,23 4:7
5:14

**Mitchell** 56:20,21,
24 57:1

mjicka@
watkinseager.com
2:18

**month** 25:15 51:8
61:1

**months** 16:18,21
34:2,5 35:6 51:8
61:9

**mother** 24:9

**motion** 21:11

**motions** 20:24

**Motor** 1:6,19 2:20
50:11 51:2

**motorcycle** 7:5
8:21 12:23,25 13:4,
11,15,17,19,25
15:7,10,12,16,23
16:7,15 18:14,16
20:4,6,8 21:15,18,
20 22:15,16,17,18,
21,22 23:3,17,22
24:23 25:8 26:4
28:9 29:2,10,12,15
32:4 33:7 35:7,12
36:21 41:8 42:15
43:25 44:4 45:18,
19 51:20,22 55:13
58:13,21 59:19

**motorcycles** 12:22
14:12 15:25 16:5,6
25:1

**moved** 29:15 36:12

**movement** 40:3

---

**N**

**N.K.** 17:10 61:8

**named** 23:17

**names** 16:25

**nature** 10:6 49:10,
16

**necessarily** 32:5

**needed** 50:18

**negative** 53:21

**nice** 11:6

**Nissin** 1:6 2:14
16:24 19:5 20:14
50:12,24 59:21

**NORTHERN** 1:2

**Notary** 4:6

**notes** 31:19 45:25

**notice** 3:15 6:8,19
18:17,20:9 51:23

**notices** 4:11

**notify** 22:23 49:15,
21

**November** 25:23,
25 26:1 61:5

**number** 7:4 24:4
27:6,9,10,19,20,22
42:20 55:13

**numerous** 11:6

---

**O**

**object** 12:14 42:25

**objections** 4:20

**objects** 12:18
28:24

**observance** 47:20

**observation** 25:12
37:17 60:1,5

**observe** 30:15
38:12,15 39:2
40:13,24 42:8

**observed** 17:9 34:9

38:7,20,22 39:19
40:1,17,20 41:1
43:4 48:3 54:15,22
59:22 60:14,18

**observing** 43:2

**Obtain** 48:15

**occasion** 22:6

**occur** 48:7 54:17

**occurred** 16:10

**occurring** 48:7

**October** 3:17,18
18:4 19:13,14
25:24 26:2 36:12
44:16 51:18

**off-the-record** 62:1

**offer** 11:23

**office** 20:20

**offices** 1:23 5:12
11:13

**oil** 29:13

**older** 17:11

**operate** 29:10 32:3
46:23 53:17 54:2

**operated** 14:19
15:16 35:7 45:22
59:24

**operating** 38:22

**operation** 36:20
59:23

**opinion** 35:2 52:7

**opinions** 44:25
52:22

**opportunity** 18:18
20:10 49:24 51:23

**Ex. A-26**

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                     Index: opposed..produced

**opposed** 9:18

**oral** 1:10,17 4:4
5:16

**order** 3:14 6:7,15
36:6 37:23 55:11

**ordered** 36:6

**ordering** 55:19

**original** 5:1 33:4
47:14

**or --** 13:23

**owned** 12:22

**Oxford** 14:1

---

**P**

**paid** 11:24 26:7
58:21

**Palmer** 10:23

**paragraph** 18:12
20:11 21:14,19
22:14 36:24

**paraphrasing**
36:11

**parking** 31:1 35:16
54:15

**Parkway** 1:24 2:22
5:13

**part** 12:1 20:23
25:24,25 31:1 36:4
48:9

**participants** 55:20

**participate** 49:24
51:15

**participating** 19:10

**parties** 4:3 21:16
44:13 49:21,23

**party** 11:9

**pass** 58:25

**passed** 56:6

**passing** 56:8,10

**paved** 31:2

**pay** 26:3,6,8 45:2

**percent** 10:4

**percentage** 9:20
10:1 41:5

**perfectly** 52:22

**perform** 49:13

**performance** 60:8,
9

**performed** 40:24,
25 50:13 60:3

**performing** 24:24
41:2

**period** 37:3 45:11

**person** 49:12

**personal** 36:11

**personally** 50:21

**pharmaceutical**
11:19

**phone** 7:15 26:21,
23 27:12,15,19,21,
22,24

**photographs** 8:4,5
17:12 31:14 42:6
43:19

**photos** 41:23 42:3
52:1

**physical** 12:14,18
48:14,16,17,19,22

**picked** 29:6

**piece** 21:15

**place** 30:22 36:16

**PLAINTIFF(S)** 2:2

**plaintiffs** 1:4 44:15

**plan** 18:15 20:7
48:16 51:21

**planning** 49:13

**plans** 48:18

**pleasure** 59:4

**PLLC** 2:4,11 11:14

**point** 16:11 18:20
22:12 27:5 40:8
56:9,13

**Polk** 2:21

**position** 32:13,14
47:3,11,12 59:14

**positions** 35:17,19
37:8

**possession** 36:10

**possibility** 48:19

**post-accident**
22:20

**potential** 33:13

**Practice** 48:13

**practicing** 9:12

**pre-litigation** 16:15
51:1 59:21,24
60:25

**preclude** 49:11,18

**prepare** 45:20 52:4

**prepared** 46:10

**Preparing** 49:7

**presence** 17:22
33:10 50:23

**present** 8:22 11:3
18:18 20:10,14
51:3,24 57:6

**presented** 50:2

**preservation** 22:3
23:9,13 48:13
61:15,16

**preserve** 16:19
18:14 20:6 21:18
48:16 51:20

**preserved** 12:15,19
43:20 48:23 50:19
60:9 61:17

**pressure** 32:15
47:4,21 49:2

**Preston** 7:6,11,13,
14 23:18,19 26:19
27:6 28:7 29:9,17
31:21 32:8 40:15
41:6,20 42:15,18
43:9,21,24 44:16,
20 50:13 52:2,4
53:1 54:3,16,21
55:13 57:2 58:9,18,
21 59:18,22,23
60:13 61:4

**Pretty** 30:8

**prior** 18:17 20:9
51:23

**Procedure** 4:10,13,
23 5:10 6:9

**procedures** 49:24

**proceedings** 5:17

**process** 11:12

**produce** 8:14

**produced** 1:18 8:5,
19 41:23 57:12

**product** 9:21 10:18 11:15,20 12:3,6,11, 12,13,18

**products** 10:6,11 11:18

**professional** 23:22

**proper** 30:16

**properly** 41:11 52:8 61:17

**Properties** 28:5

**proposed** 45:20 49:9,14,16,22

**protect** 48:17

**protected** 44:24 45:1

**protocol** 16:22 52:5,6,9

**provided** 4:12 5:10 27:5 33:8

**provider** 27:24

**provisions** 4:9,22

**Public** 4:7

**pull** 17:13,14,15,21

**pulled** 32:10 33:10

**pulling** 17:16,18 60:15

**purchase** 15:7

**pure** 14:20 36:25

**purpose** 52:21 61:18

**pursuant** 6:7,8 7:7 55:11

**pursue** 11:21 18:13

**put** 12:10 13:9,19 29:17 32:13 47:3

---

**Q**

**quantify** 34:13,14

**question** 4:21 31:24 40:22 43:12 46:10 48:5 53:23, 25 58:1

**questions** 9:11 23:18 54:13 56:16 59:2,9,14,18 62:3

---

**R**

**Randolph** 2:6

**randy@ cochranedwardsla w.com** 2:8

**re-notice** 6:17

**reach** 56:3

**read** 6:10,13 7:22 8:18 20:23 22:10, 12

**reading** 4:14 18:18 50:4

**ready** 54:9

**rear** 15:17 30:17 39:4,7,9

**reason** 45:13

**recall** 10:11,16,17 16:14,25 18:18 19:17,20 20:21,22 21:9,11,12,22,23 22:4 30:3 33:17,20 34:8,10,11,20 35:22 36:22 37:1 42:16 55:21,23 57:18,19 60:21

---

**recalled** 58:9

**receive** 18:4,6,7 19:15

**received** 20:17 23:8,12 51:1

**receiving** 19:17,20 20:22 21:12

**recent** 60:10

**recollection** 26:1 33:9,17 37:11

**recommend** 49:20, 22

**record** 6:5 16:8 34:24 49:25 54:10

**recorded** 49:2

**recovery** 11:25 48:21

**recreate** 52:20

**reflect** 6:5

**regard** 7:10,14 12:6 41:3 50:9 54:23 60:16

**regular** 54:20

**related** 8:4 9:21 24:12 28:24

**relatives** 56:19

**relevant** 15:6,8 35:1

**remain** 21:21

**remember** 17:11,17 28:6 55:18,24 61:1

**replaced** 45:18

**reported** 1:22 10:10

---

**Reporter** 5:9 21:25 55:5

**Reporter's** 3:9

**represent** 16:12

**representation** 11:23

**representations** 44:8

**representative** 50:11,12 51:3

**representatives** 17:1,4 44:7

**request** 21:20

**requested** 61:16

**requests** 7:4

**required** 44:13

**requirements** 4:17

**reserved** 4:21

**resistance** 20:1

**respective** 4:3

**responded** 44:19

**response** 36:23 47:1

**responsive** 34:12 35:4

**result** 11:20

**return** 26:23

**review** 22:6

**reviewed** 12:8 22:2 57:9

**Richard** 2:6

**ridden** 16:6 25:2,4

**ride** 13:25 14:14,23 15:25 25:16 31:7

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                Index: rider..stipulation

35:11 41:4,7 46:18
58:10,12 60:19

**rider** 23:22,25 44:4

**rides** 54:24

**Ridgeland** 1:25
2:23 5:13

**riding** 7:6 12:22
14:12,25 23:16
25:22 26:3,11,15
28:7 29:9 30:20,22,
25 31:11,25 32:21
39:17 41:20 42:18
45:8 50:12,16
52:10,13 54:4,21,
22 57:16 58:21

**Road** 2:7

**Robert** 2:21 5:2

**rode** 14:21,22 16:5
32:16 35:9 37:6
46:2,17,20 59:18
60:13,14 61:5

**rolling** 40:12

**roll call** 17:5

**Rules** 4:10,13,23
5:10 6:9

**run** 48:5

**runs** 33:9

———————

**S**

———————

**saved** 4:20

**scene** 33:13

**Schedule** 7:4

**scientific** 25:11
44:2

**scratchings** 22:22

**scuff** 42:9,14,17
43:4,8

**scuffs** 45:24

**seal** 31:3,13 54:17,
19 55:2

**search** 7:11,12,18

**seconds** 39:21
40:4,7

**Section** 49:8

**sections** 4:9,12

**secure** 21:21

**sell** 15:5

**selling** 15:11 22:15

**send** 8:11

**September** 1:12,21
5:14 16:16,23
25:19 29:9 36:21
42:4 50:25 59:20
61:2,10

**series** 41:23 42:3

**served** 45:10

**service** 56:21

**Services** 36:17
42:7 46:1

**set** 4:19 55:15

**shaking** 53:21

**shear** 14:2,5,8

**short** 54:8 59:12
62:2

**shorthand** 1:23

**shortly** 25:16

**show** 55:3

**side** 35:15,16

**sign** 6:10,14 7:23

**significant** 48:18

**signing** 4:15,16

**similar** 20:16 54:21

**simulate** 52:19

**sir** 35:8 54:11

**sit** 9:5 12:20 32:24
48:10 50:8

**sitting** 10:19 34:21

**skidded** 38:9,10

**skidding** 38:12,15

**slow** 39:23 40:6

**Smyrna** 2:8

**Snow** 1:23 2:22
5:12 9:2

**soccer** 30:23

**sold** 15:3

**son** 8:6 58:16

**sort** 4:18 12:13
52:5 56:5

**South** 28:16,20
29:3 36:13 53:3

**SOUTHERN** 1:1

**space** 46:11,15
48:5

**spacing** 46:14

**speak** 14:17

**specific** 28:6

**specifically** 20:22
33:16

**speed** 32:3 40:3

**speeds** 38:3

**spoken** 56:3

**squeeze** 46:20

**Sr** 2:11 6:23 9:24
10:1,15 11:8 13:8
15:6,11 18:22
42:25 43:5,11
53:22 54:11 56:9,
13 57:24 58:2,6
59:3,6,13,16

**Sr.............59** 3:7

**standard** 48:12
49:5

**standards** 21:10
22:2,7,9,11 48:9

**standing** 38:25

**start** 34:17

**started** 9:3 17:16

**state** 1:22,25 28:16,
20 29:3 36:14
48:23 49:10,17
53:3

**stated** 51:9

**statement** 12:1
18:25 41:3 57:20

**statements** 19:1

**STATES** 1:1

**stating** 33:8

**stationary** 21:21

**statute** 44:5 51:7

**stayed** 29:20,21
53:5

**sticks** 17:9

**stipulated** 4:2,11
5:1

**stipulation** 5:11

Ex. A-29

**STIPULATIONS** 4:1

Stipulations............
...........................4
3:4

**stop** 15:20 31:25 33:7 39:23 40:6,7, 12 41:4 45:19

**stopped** 34:25 40:10

**stopping** 20:3 34:19 60:17

**storage** 36:13

**store** 28:24

**stored** 21:21 27:12, 15 29:7

**street** 2:4,12,17 13:17 28:17,20 29:3 36:14 53:3

**Stubblefield** 1:3 7:19,20,24 8:1,12, 13 16:11 32:6 36:10

**Stubblefield's** 20:4 28:13 29:4,22 31:22 33:15 42:5

**Stubblefields** 16:9

**stuff** 10:5 17:6 55:1

**subject** 8:20 16:15 21:14,20 22:15,16, 17,18,20,22 23:3, 17 55:12

**subjective** 52:7

**submit** 44:13

**submitted** 44:15 57:10

**subparagraph** 48:15

**subpoena** 6:8,22 7:3,7

Subpoena................
...................6 3:16

**subsequent** 54:22 59:25

**subsequently** 16:21 18:7

**successfully** 11:14

**sufficient** 20:2

**suicide** 56:16

**suit** 20:6 51:20

**Suite** 1:24 2:22 5:13

**supposed** 7:22 51:11,13

**surface** 30:9

**surfaces** 31:8

**Suzuki** 1:6,19 2:20 16:17,23 18:5 19:5 25:4 49:2 50:11,17, 19,24 51:2,14 52:23 59:21 61:8

**Suzuki's** 32:23 52:21

**sworn** 1:19 6:2

---

**T**

**taking** 4:18 6:17,18 17:12

**talk** 24:14 57:1

**talked** 24:17

**talking** 31:5 58:3

**team** 11:20

**Technical** 36:16 42:7 46:1 48:14

**technicalities** 4:17

**tecum** 7:3

**telephone** 2:6 27:6 55:21

**telephonic** 55:18

**ten** 14:4

**test** 7:5 25:12 26:11 28:7 30:12,25 32:11 39:17 41:19 42:18 45:8 48:6 50:12 58:10,21 60:19

**tested** 20:15 42:15 49:2

**testified** 6:4 58:14 59:19

**testing** 18:16 20:8 22:18 28:15 30:2,5 31:10,15 43:25 44:3 45:4,15,21 46:7,15 48:4,6 49:12,18 50:20 51:4,10,11,13,15, 22 52:2,5,11 53:1 54:15 55:20 60:2 61:19

**tests** 26:15 49:9

**text** 26:18,20,23 27:2

**texted** 8:9

**texts** 7:13,25 8:3,6, 7,8

**thereof** 4:15

**thing** 47:18 48:3 56:5 60:18 61:25

**things** 36:23 58:19

**thinking** 10:19 58:17

**Thomas** 2:21 20:25 21:3,5 61:25

**thought** 14:1,8 45:12

**thoughts** 37:2

**thousand** 60:22

**time** 4:21 7:17 9:15 16:11,12 19:12 27:5,17 29:8 30:5 33:3 37:11 38:18 39:4,11,14 40:2 42:9 45:11 46:8 47:19 52:25 53:8, 18 54:4,16 56:13

**times** 14:21,22 17:21 32:10 33:6, 10 37:8,9 38:21 39:9,12,15 46:23 53:13

**tire** 42:20 43:9,17, 18,21

**tires** 41:19 42:9,22 43:4 45:25

**titled** 48:12

**today** 9:5 12:20 32:24 48:10 50:8 55:12,15

**Todd** 3:21 41:24 42:21,24

**told** 19:11 32:1,5 40:21 50:21 58:10

**ton** 16:4

**total** 14:18

**touch** 23:23 47:23

BRADLEY AND KRISTAN STUBBLEFIELD vs SUZUKI MOTOR CORPORATION, ET AL.
Michael J. Malouf, Jr. - 09/11/2017                                    Index: town..young

55:14

town 13:25

toys 11:17

tractors 11:18

trailer 28:11,12,13
29:5,18,19,20,21,
23,25 32:9 53:2

training 14:11

transcript 5:2

trial 4:21

trip 14:23

trips 13:22

true 58:22,24

truth 6:3,4

truthful 58:15

turn 39:1

turned 7:16

turns 56:6

Twenty 9:13

two-second 59:10

type 32:15,20 33:24
39:2 46:14

types 12:17 25:1

—

U

Uh-huh 26:25 27:8
31:4

unable 56:3

uncle 56:23,25

understand 20:11
37:25 43:11,12

understanding
43:15

undisclosed 44:23

unit 36:13

UNITED 1:1

unusual 55:25

updated 27:19

—

V

valid 25:12

validate 52:21

video 6:17,18 31:17
45:25 49:1

violate 61:15

visited 56:21

voice 27:3

Volkswagen 10:24

Volume 1:13

—

W

wait 42:19

waived 4:13

wanted 19:8 20:11,
14 26:15 32:12
44:10 46:9

warehouse 28:16,
18 29:3,7,16 53:3,
9,20 54:3

warm 32:11

Watkins 2:16 19:15

wearing 52:10,15

weather 30:7

website 11:11 12:2,
7

weekend 30:2

weekends 14:22

weeks 61:6,7,9,12

welder 10:22

whatsoever 57:20
61:22

wheel 37:19,23
38:5 39:4,8,10,13,
19 40:9,10 54:17

wheels 40:8

WIFE 1:4

will.thomas@
butlersnow.com
2:24

William 2:21

wind 14:2,5,9

windshield 14:7,8,
9

Wingate 6:16

Wingate...................
.6 3:14

wording 12:7

words 50:4 57:15

work 9:20 10:15
15:22

worked 40:19

workers' 10:5,20

working 44:2 52:8,
22

Workspace 10:11

worth 35:14

wrecked 41:7 58:11

writing 26:17

written 27:13

wrong 41:8,12,14,
16 44:9 57:17
58:12

wrote 25:22 35:21

—

X

XYZ 1:7

—

Y

y'all 45:9 49:1
50:14,15 51:8,9,10,
11 54:9 57:4

y'all's 20:23

Yamaha 13:2,14
14:19

yards 45:23

year 13:16 14:24
25:15 45:9

years 9:9,13,22
11:16 12:9 15:7
16:1 24:18 34:1,2,5
35:6 56:4

Yerger 11:8,9

young 23:17